## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC.,                                    ) | |
|                Plaintiff,      ) | |
|       vs.                                         ) | Civil Action No. 07-cv-1446 (PLF) |
| U.S. DEPARTMENT OF COMMERCE, et   ) | |
|    al.,                                                        ) | |
|              Defendants.  ) | |

### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

### INTRODUCTION

Judicial Watch, Inc., has filed a complaint against the Commerce Department and the Secretary of Commerce in his official capacity (collectively "the Commerce Department"), alleging that the defendants' interactions with the North American Competitiveness Council (NACC), a trilateral council of business leaders representing the private sectors in the United States, Canada, and Mexico, violate the Federal Advisory Committee Act (FACA), 5 U.S.C. app. §§ 1–16. Judicial Watch seeks a temporary restraining order or preliminary injunction compelling the defendants to permit Judicial Watch to attend a meeting in Montebello, Canada, on August 20 and 21, 2007, at which the NACC is scheduled to meet with the President of the United States, the leaders of Mexico and Canada, and cabinet secretaries and ministers from the three countries.

Judicial Watch's motion for a temporary restraining order or a preliminary injunction should be denied because it fails to satisfy any of the four factors necessary to obtain temporary or preliminary injunctive relief. Judicial Watch has no likelihood of success on the merits

because FACA simply does not apply to the NACC or its subordinate advisory groups. In arguing otherwise, Judicial Watch relies on an interpretation of FACA that has been foreclosed by three decades of Supreme Court and D.C. Circuit precedent recognizing tight limits on the scope of FACA. Furthermore, Judicial Watch lacks standing because it filed this litigation before the agency has taken action on Judicial Watch's request for information pertaining to the NACC. Moreover, given the structure and international nature of the NACC, Judicial Watch's other supposed injuries cannot have been caused by the Commerce Department alone and would not be redressed by an order against the Commerce Department. Judicial Watch also fails to state any claim that would fall within this Court's mandamus jurisdiction, and similarly fails to state a valid claim under the Administrative Procedure Act.

Judicial Watch has made no showing of irreparable harm, moreover, because it has not shown how exclusion from a single upcoming meeting would permanently impede Judicial Watch's ongoing efforts to examine the NACC. And, an injunction against the defendants would not necessarily allow Judicial Watch to attend the August 20–21 meeting in Montebello, Canada in any event. Finally, Judicial Watch has not offered anything more than bare assertions that a grant of injunctive relief would not harm other parties and would serve the public interest. A grant of such relief would surely harm other parties and the public interest by disrupting a meeting of top regional leaders held on Canadian soil.

For all of these reasons, as further explained below, Judicial Watch's request for preliminary relief should be denied.

## BACKGROUND

**I.      Statutory Background of the Federal Advisory Committee Act**

The Federal Advisory Committee Act (FACA), 5 U.S.C. app. §§ 1–16, enacted in 1972,

was "born of a desire to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.' Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature." Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 445–46 (1989) (quoting 5 U.S.C. app. § 2(a)) (citation omitted).

FACA places limits on the creation and public operation of bodies that fall within the Act's definition of "advisory committee." 5 U.S.C. app. § 3(2). To fall within the definition, a group must be either "established by statute or reorganization plan" or "established or utilized" by the President or one or more agencies, and the group's establishment or utilization must be "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." Id. § 3(2). The Supreme Court and the D.C. Circuit have accorded a restrictive interpretation to these terms, in keeping with Congress's intent to focus the Act on a narrow class of advisory groups. See, e.g., Pub. Citizen, 491 U.S. at 452–53. The D.C. Circuit has determined, for example, that a group is "established" by the government only if its members are appointed by the government directly, without the involvement of any intermediary, and that a group is "utilized" by the government only if the government exercises actual management or control over the group. See, e.g., Byrd v. U.S. EPA, 174 F.3d 239, 245–46 (D.C. Cir. 1999).

The Act regulates such "advisory committees" in a number of ways. For example, the

Act prohibits the establishment of new advisory committees in the absence of specific statutory or presidential authorization or a formal determination by an agency that such establishment would be in the public interest. Id. § 9(a). In addition, the Act, in pertinent part, also provides that a committee subject to the Act must file a charter, id. § 9(c); keep detailed minutes of its meetings, id. § 10(c); provide advance notice of its meetings and open them to the public, unless the President or agency head determines that a meeting may be closed in accordance with the Government in the Sunshine Act, id. § 10(a), (d); and make its records, reports, transcripts, minutes, working papers, studies, agenda, and other documents publicly available subject to the terms and exemptions of the Freedom of Information Act, id. § 10(b).

## II.    The North American Competitiveness Council (NACC)

On March 23, 2005, the President of the United States, the Prime Minister of Canada, and the President of Mexico met in Waco, Texas, and launched the Security and Prosperity Partnership of North America (SPP), a joint initiative aimed at enhancing the security and prosperity of the three countries through greater cooperation. See Compl. for Declaratory and Injunctive Relief & Pet. for Writ of Mandamus ¶ 9; Decl. of Walter M. Bastian ¶ 2 (hereinafter Bastian Decl) (attached as Ex. 1). The SPP seeks to address subjects of mutual interest to the United States, Mexico, and Canada in areas such as the movement of goods, traveler security, energy, environment, and health. Bastian Decl ¶ 3.

In a June 23, 2005, Report to Leaders, U.S., Mexican, and Canadian cabinet secretaries and ministers described an initiative to "[w]ork to more effectively identify and respond to factors affecting the competitiveness of the North American economy." Bastian Decl Attach. 2. In 2005 and 2006, the three governments discussed the possibility of encouraging greater input from the private sector on ways to enhance North American competitiveness. Bastian Decl

4

¶¶ 4–6. By early 2006, these discussions produced a concept paper envisioning a trilateral group led by the private sector. Bastian Decl Attach. 4.

On March 15, 2006, U.S., Mexican, and Canadian business leaders met with Secretary of Commerce Carlos M. Gutierrez and representatives from the governments of Mexico and Canada to discuss North American competitiveness and the development of a trilateral private-sector group. Bastian Decl ¶ 7. The meeting was hosted by two private groups, the Council of the Americas and the U.S. Chamber of Commerce.[1] Bastian Decl ¶ 7. The Secretary of Commerce delivered opening remarks at the meeting. Bastian Decl ¶ 7. The Council of the Americas and the U.S. Chamber of Commerce offered to act as the U.S. Secretariat of the proposed private-sector group. Bastian Decl ¶ 7.

On March 31, 2006, the President of the United States, the Prime Minister of Canada, and the President of Mexico announced the formation of the North American Competitiveness Council, a trilateral private-sector council that, as described in a statement issued by the three countries' leaders, "will comprise members of the private sector from each country and will provide us recommendations on North American competitiveness, including, among others, areas such as automotive and transportation, steel, manufacturing, and services." Bastian Decl Attach. 5. A White House press release issued the same day described the NACC as follows:

> The North American Competitiveness Council. Increasing private sector engagement in the SPP by adding high-level business input will assist governments in enhancing North America's competitive position and engage the private sector as partners in finding solutions. The Council will:

---

[1]The Council of the Americas describes itself as a private nonprofit organization of businesses that seeks to promote free trade and open markets in the Americas. See Council of the Americas, Mission, http://counciloftheamericas.org/coa/about/mission.html (last visited Aug. 14, 2007). The U.S. Chamber of Commerce describes itself as a private business organization that seeks to promote business and free enterprise. See U.S. Chamber of Commerce, About the U.S. Chamber of Commerce, http://www.uschamber.com/about/ (last visited Aug. 14, 2007).

- Consider issues that could be addressed trilaterally or bilaterally, as improvements in our bilateral relationships enhance North American competitiveness.

- Address issues of immediate importance and provide strategic medium and long-term advice.

- Provide input on the compatibility of our security and prosperity agendas, given the linkages between security and prosperity in a global marketplace.

- Offer ideas on the private sector's role in promoting North American competitiveness.

Bastian Decl Attach. 6.

On June 15, 2006, the Secretary of Commerce and his counterparts in the Mexican and Canadian governments met with private-sector representatives at a launch ceremony for the NACC. Bastian Decl ¶ 10.

The NACC consists of thirty private-sector business leaders, ten from each country. Bastian Decl ¶ 11. Each country's component is supported by its own Secretariat; the Council of the Americas and the U.S. Chamber of Commerce jointly serve as the Secretariat of the U.S. component. Bastian Decl ¶ 11. The ten members of the U.S. component that attend each full NACC meeting come from a pool of fifteen companies selected by the Council of the Americas and the U.S. Chamber of Commerce without the involvement of any U.S. government official.[2] Bastian Decl ¶¶ 12–14. The U.S. government has never funded or appointed the members of either the NACC or its U.S. component, it has never scheduled meetings or set meeting agendas for either body, and it has never participated in developing their work product. Bastian Decl ¶ 16. With respect to the U.S. component of the NACC, these functions have been handled by

---

[2] Judicial Watch's complaint refers to this group of fifteen members—the U.S. component of the NACC—as the "Executive Committee." Compl. ¶ 22.

the Council of the Americas and the U.S. Chamber of Commerce. <u>See</u> Bastian Decl ¶ 16.

The Council of the Americas and the U.S. Chamber of Commerce have established an advisory council to the U.S. component.[3] According to the NACC, the advisory council has approximately 200 members. <u>See</u> North American Competitiveness Council, NACC Members (2007), <u>available at</u> http://www.uschamber.com/issues/index/international/nacc.htm (follow "Members" hyperlink). The Council of the Americas and the U.S. Chamber of Commerce set the parameters for participating in this group; no U.S. government official had any role in establishing the advisory council or has ever attempted to manage the group. Bastian Decl ¶ 15.

Since its formation, the NACC has met with the Secretary of Commerce and his counterparts in the governments of Canada and Mexico three times. Bastian Decl ¶ 17.a. The first meeting was the June 15, 2006, launch of the NACC. Bastian Decl ¶ 17.a. The second occasion was a Ministerial Meeting on February 23, 2007, at which the NACC delivered its first report—so far, its only report—to a group of U.S., Canadian, and Mexican cabinet secretaries and ministers, including Secretary of Commerce Gutierrez, Secretary of State Condoleezza Rice, and Secretary of Homeland Security Michael Chertoff and their counterparts in the Canadian and Mexican governments. Bastian Decl ¶ 17.a. The third meeting was in June 2007, when the NACC Secretariats, without the members of the NACC, met with the Secretary of Commerce and his Canadian and Mexican counterparts in Atlanta, coinciding with the Americas Competitiveness Forum. Bastian Decl ¶ 17.a.

The Security and Prosperity Partnership of North America (SPP)—the three-country initiative launched in 2005—will hold a Leaders Meeting on August 20 and 21, 2007, in

---

[3]Judicial Watch's complaint refers to this group of 200 companies as the "Advisory Committee." Compl. ¶ 23.

Montebello, Canada. Bastian Decl ¶ 19. During this meeting, the President of the United States, the Prime Minister of Canada, the President of Mexico, and the group of cabinet secretaries and ministers are scheduled to meet with the NACC so that the NACC can deliver a report to the leaders of the three countries. Bastian Decl ¶ 19. Judicial Watch seeks immediate access to this meeting in Montebello, Canada.

**III.    Judicial Watch's Investigation of the NACC**

Judicial Watch describes itself as a nonprofit public interest organization that "seeks to promote integrity, transparency, and accountability in government and fidelity to the rule of law." Compl. ¶ 3. According to Judicial Watch's complaint, Judicial Watch has been investigating and monitoring the NACC since approximately July 2006. Compl. ¶ 28. According to the complaint, Judicial Watch's investigative efforts have included FOIA requests to various federal agencies and correspondence with the U.S. Chamber of Commerce, which serves jointly with the Council of the Americas as the Secretariat for the U.S. component of the NACC. See Compl. ¶¶ 28–30.

Judicial Watch's complaint states that on July 26, 2007, it sent a letter to the Secretary of Commerce requesting that the Secretary "acknowledge that the NACC and its U.S. component subcommittees are advisory committees under FACA and . . . bring their operations into compliance with all appropriate laws and regulations"; "confirm" within eight days that the Montebello meeting "will be open to Judicial Watch and the general public"; and "make all . . . records of the NACC and its U.S. component subcommittees available to Judicial Watch." Pl.'s Application for a TRO and/or Prelim. Inj. and Req. for Expedited Hr'g Ex. 12 at 2. The Commerce Department has not yet responded to the request.

**IV.    Judicial Watch's Complaint and Request for Preliminary Relief**

Judicial Watch filed its complaint in this action on August 10, 2007, against the Department of Commerce and the Secretary of Commerce in his official capacity. The suit seeks: (1) a declaratory judgment stating that the NACC, the 15 member companies who serve as the U.S. component of the NACC (whom the complaint collectively refers to as the "Executive Committee," Compl. ¶ 22), and the advisory council established by the U.S. NACC Secretariat (which the complaint refers to as the "Advisory Committee," Compl. ¶ 23) are subject to FACA and that the defendants have violated FACA; (2) an injunction barring the defendants from continuing the alleged noncompliance with FACA; (3) mandamus relief ordering defendants to perform "all nondiscretionary duties required by FACA with respect to the operation of the three groups"; and (4) a permanent injunction requiring defendants to provide all records and other materials made available to or prepared by or for one of the three groups, including all records that would be exempt from disclosure under certain provisions of the Freedom of Information Act. Compl. at 12–14.

Judicial Watch has also filed a motion for a temporary restraining order or a preliminary injunction requiring the Commerce Department to open any meetings of the NACC, the 15 members of the U.S. component of the NACC, or the advisory council created by the U.S. NACC Secretariat to Judicial Watch and the public at the meeting scheduled to take place on August 20 and 21, 2007, in Montebello, Canada. Pl.'s Application at 13.

## ARGUMENT

### I.    Standards for Issuance of a Preliminary Injunction

Preliminary injunctive relief is an extraordinary remedy, and the power to issue such an injunction "should be sparingly exercised." Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation marks omitted). For a plaintiff to prevail on a motion for preliminary relief, it

must demonstrate: (1) a substantial likelihood of success on the merits; (2) that it would suffer

irreparable injury if the injunction is not granted; (3) that an injunction would not substantially

injure other interested (nonmoving) parties; and (4) that the public interest would be furthered by

the injunction. CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir.

1995); see also, e.g., Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841,

842–43 (D.C. Cir. 1977); Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921,

925 (D.C. Cir. 1958). The plaintiff must satisfy each of these four factors separately, and the

court must further find that these four factors together justify the drastic intervention of a

preliminary injunction. See CityFed Fin. Corp., 58 F.3d at 747; Chaplaincy of Full Gospel

Churches v. England, 454 F.3d 290, 304 (D.C. Cir. 2006). Moreover, if a plaintiff has little

likelihood of succeeding on the merits of its claim, the court need not address the other

preliminary injunction factors. Apotex, Inc. v. Food & Drug Admin., 449 F.3d 1249, 1253–54

(D.C. Cir. 2006); CityFed Fin. Corp., 58 F.3d at 746 (requiring the moving party to "demonstrate

. . . a substantial likelihood of success on the merits"); City of Las Vegas v. Lujan, 891 F.2d 927,

935 (D.C. Cir. 1989) (affirming district court's denial of preliminary injunction without

addressing irreparable injury because appellant had insufficient likelihood of success on the

merits).

Judicial Watch has not established any of the four factors required for preliminary relief.

The most glaring obstacle is that Judicial Watch has no likelihood of success on the merits,

because FACA simply does not apply to the NACC, the U.S. component of the NACC, or the

advisory council created by the U.S. NACC Secretariat. The nature and level of the

government's involvement in the creation and operation of the NACC fall far short of what

would be required to bring the NACC within FACA. Judicial Watch's complaint also suffers

from various jurisdictional defects and the absence of any valid cause of action. Judicial Watch

also has failed to demonstrate any irreparable harm because exclusion from a single two-day

meeting does not pose a permanent obstacle to what Judicial Watch describes as a longstanding

campaign to monitor the NACC's activities. Judicial Watch makes no more than a perfunctory

effort to establish either of the two remaining factors—that interim relief will not harm others,

and that interim relief would be in the public interest. The Court therefore should deny Judicial

Watch's application for preliminary relief.

**II.    Judicial Watch has not demonstrated a likelihood of success on the merits, because the NACC, its U.S. component, and the associated advisory council are not "advisory committees" subject to FACA.**

    **A.    The NACC, its U.S. component, and the associated advisory council are not "established or utilized" by the government for the purposes of FACA's coverage provision.**

The NACC, its U.S. component, and the advisory council created by the U.S. NACC

Secretariat do not qualify as "advisory committees" subject to the terms of FACA, because the

D.C. Circuit has held that groups whose members are not appointed directly by the government

and that are not under the government's actual management or control are not "established or

utilized" by the government in a way that triggers FACA's coverage provision, 5 U.S.C. app.

§ 3(2). Moreover, reading FACA to regulate the government's dealings with foreign

governments and foreign private citizens would raise serious constitutional doubts and would

violate principles of statutory interpretation that presume that Congress is reluctant to regulate

matters outside United States territory.

FACA applies to bodies qualifying as "advisory committee[s]." 5 U.S.C. app. § 4(a)

(applying FACA to "each advisory committee," with some exceptions). To be an "advisory

committee," a group must be "established or utilized" by the government within the meaning of

§ 3(2):

> (2) The term "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereafter in this paragraph referred to as "committee"), which is—
>
>> (A) established by statute or reorganization plan, or
>>
>> (B) <u>established or utilized</u> by the President, or
>>
>> (C) <u>established or utilized</u> by one or more agencies,
>
> in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government, and (ii) any committee that is created by the National Academy of Sciences or the National Academy of Public Administration.

<u>Id.</u> (emphasis added).

The Supreme Court interpreted this provision in <u>Public Citizen v. U.S. Department of Justice</u>, 491 U.S. 440 (1989), which dealt with the Justice Department's consultations with an American Bar Association (ABA) committee in the judicial nomination process. The Court recognized that the terms of § 3(2), if taken literally and out of context, could lend themselves to an expansive interpretation that could encompass "any formal organization[] from which the President or an Executive agency seeks advice." <u>Pub. Citizen</u>, 491 U.S. at 452. But the Court concluded that Congress clearly did not intend the statute to reach that broadly. The Court wrote, "FACA was enacted to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals; although its reach is extensive, we cannot believe that it was intended to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice." <u>Pub. Citizen</u>, 491 U.S. at 453.

Accordingly, the Court concluded that Congress included the term "utilized" in the

FACA so that the statute not only covered government-created committees, but also reached a narrow class of privately formed committees. Id. at 462. However, the Court concluded that a privately formed committee "not amenable to . . . strict management by agency officials" would not fall within the reach of the statute. Id. at 457–58. Hence, even though the Justice Department undoubtedly "utilized" the ABA committee in a common sense, the committee was not an "advisory committee" subject to FACA. See id. at 452, 463–65.

In keeping with this approach, the D.C. Circuit has consistently accorded a restrictive interpretation to the terms "established" and "utilized." See generally Byrd v. U.S. EPA, 174 F.3d 239, 245–46 (D.C. Cir. 1999). The D.C. Circuit has determined that an advisory committee is "established" by the government only if it is "actually formed" by the government. Id. at 245 (citing Pub. Citizen, 491 U.S. at 452, 456–57). This means the government must do more than conceive, encourage, or facilitate the creation of the body in question. The government must actually select the group's members. Id. at 246–47 (finding that even though the EPA had conceived the need for a panel, had hired a private consulting firm to select and manage the panel, and had had considerable involvement and authority in the panel's selection, the fact that the panel's members were selected by the consulting firm and not directly by the EPA meant that the plaintiff "cannot show" that the panel was "established" by the EPA); Food Chem. News v. Young, 900 F.2d 328, 333 (D.C. Cir. 1990) (holding that an expert panel convened by a private scientific organization under contract with the FDA was not directly "established" by the FDA).

The D.C. Circuit has also expanded on the Supreme Court's interpretation of the term "utilized." "The word 'utilized' . . . is a stringent standard, denoting something along the lines of actual management or control of the advisory committee." Wash. Legal Found. v. U.S. Sentencing Comm'n, 17 F.3d 1446, 1450 (D.C. Cir. 1994); see id. at 1451 (holding that an

advisory group was not "utilized" by the Department of Justice even though the Department of Justice would have significant influence on the group's deliberations); <u>Byrd</u>, 174 F.3d at 247 ("[E]ven 'significant' influence does not represent the level of control necessary to establish that a government agency 'utilized' an advisory panel" (citing <u>id.</u>)); <u>id.</u> at 247–48 (concluding that the EPA's participation in the panel's activities did not amount to "actual management or control"); <u>Food Chem. News</u>, 900 F.2d at 333 (holding that an expert panel managed by a private scientific organization under contract with the FDA was not "utilized" by the FDA).

The NACC is neither "established" nor "utilized" by any agency of the U.S. government, including the Department of Commerce, within the meaning of § 3(2). At most, the Commerce Department and the U.S. government helped to conceive, encourage, and facilitate the creation of the NACC. The NACC itself is an outgrowth of the Security and Prosperity Partnership for North America (SPP), which is a joint initiative of the United States, Canada, and Mexico. Bastian Decl ¶¶ 2–8. In furtherance of the SPP, the leaders of these three countries together announced the creation of the NACC on March 31, 2006. Bastian Decl ¶ 8. This kind of involvement is not sufficient to qualify the NACC as a group "established" by the Commerce Department or the President. As stated in the attached Declaration of Walter M. Bastian (Ex. 1), the U.S. government did not select the members of the NACC. The members of the U.S. component were selected by the Council of the Americas and the U.S. Chamber of Commerce in their capacity as Secretariat of the U.S. component of the NACC, and the members of the Canadian and Mexican components of the NACC were selected within their own countries. <u>See</u> Bastian Decl ¶¶ 11–14. As explained above, under D.C. Circuit precedent, this fact by itself precludes any conclusion that the defendants "established" the NACC. The U.S. government also has never funded the NACC. Bastian Decl ¶ 16. <u>See Byrd</u>, 174 F.3d at 246–47.

The NACC is also not "utilized" by the Department of Commerce, because the U.S. government does not exercise "actual management or control" over the NACC. The NACC and its Secretariats coordinate the NACC's schedule, set its meetings, establish meeting agendas, and coordinate and finalize the NACC's work product. Bastian Decl ¶¶ 17.

Similarly, the U.S. component of the NACC and the advisory council created by the NACC Secretariat are neither "established" nor "utilized" by the U.S. government. The members of the U.S. component of the NACC were selected by the Council of the Americas and the U.S. Chamber of Commerce. Bastian Decl ¶¶ 12–14. The advisory council was created by the Council of the Americas and the U.S. Chamber of Commerce without the involvement of the U.S. government. Bastian Decl ¶ 15. The government has never exercised actual management or control over either the U.S. component of the NACC or the advisory council. Bastian Decl ¶¶ 15–16.

This Court concluded that FACA did not apply in a very similar case. In <u>People for the Ethical Treatment of Animals, Inc. v. Barshefsky</u>, 925 F. Supp. 844 (D.D.C. 1996), this Court denied a request for a preliminary injunction in an action alleging a FACA violation related to an expert working group established by the European Union, Canada, and the United States. The Court concluded that the working group was neither "established" nor "utilized" by a U.S. agency and was therefore not subject to FACA. The Court found it important that the group held meetings in different countries, with the host country organizing the logistics of each meeting and each participating party assuming its own costs. <u>Id.</u> at 848. The Court concluded that "the mere fact that the USTR [U.S. Trade Representative] has indirectly facilitated the formation of the group" did not mean that the group was "established" by the USTR in a way that would render it subject to FACA. <u>Id.</u> The Court similarly concluded that the group was not "utilized"

by the USTR within the meaning of FACA, because the USTR did not control the group. <u>Id.</u> The

Court noted that "[t]he working group is composed of officials from other countries over which

the U.S. Government exercises no control." <u>Id.</u> In addition, the Court again noted that the group

held meetings in different countries, with the host country organizing the logistics of each

meeting and each participating party assuming its own costs. <u>Id.</u> These facts are markedly similar

to the facts of this case, where meetings have been held in Washington, D.C., and Cancun,

Mexico, and will be held in Montebello, Canada.

> **B.**     **The NACC, its U.S. component, and the associated advisory council are not established or utilized "in the interest of obtaining advice or recommendations" on federal policy.**

FACA § 3(2) further confines the definition of "advisory committee" to groups

established or utilized by the government "in the interest of obtaining advice or

recommendations for the President or one or more agencies or officers of the Federal

Government." 5 U.S.C. app. § 3(2). To qualify as an advisory committee, the group must furnish

advice to the President or agencies or officers of the U.S. government on an "identified

governmental policy." <u>Judicial Watch v. Clinton</u>, 76 F.3d 1232, 1233 (D.C. Cir. 1996); <u>see, e.g.</u>,

<u>Sofamor Danek Group, Inc. v. Gaus</u>, 61 F.3d 929, 934–35 (D.C. Cir. 1995); <u>see also</u> <u>Consumers

Union of U.S., Inc. v. Dep't of Health, Educ. & Welfare</u>, 409 F. Supp. 473, 477 (D.D.C. 1976)

(holding that presentation of a "voluntary, industry-sponsored proposal" was not advice to the

agency), <u>aff'd</u>, 551 F.2d 466 (D.C. Cir. 1977). The furnishing of specific policy advice must be

the group's primary purpose. <u>See</u> <u>Judicial Watch v. Clinton</u>, 76 F.3d at 1233 (focusing on the

"primary activity" of the group).

The NACC does not develop specific recommendations on an "identified governmental

policy" exclusively or even primarily for the U.S. federal government. Rather, the NACC

develops general recommendations for North American regional policy priorities targeted

collectively at the governments of the United States, Canada, and Mexico. See generally, e.g.,

North American Competitiveness Council, Enhancing Competitiveness in Canada, Mexico, and

the United States: Private-Sector Priorities for the Security and Prosperity Partnership of North

America (SPP) (2007), available at

http://www.uschamber.com/publications/reports/0702nacc.htm (follow "Download the full

report" hyperlink). The NACC is simply not the kind of body whose operation Congress sought

to regulate or curtail when it enacted the FACA. See Pub. Citizen, 491 U.S. at 445–46

(describing the purpose of FACA); id. at 463–64 (rejecting a "literalistic reading" that "would

catch far more groups and consulting arrangements than Congress could conceivably have

intended").

　　　　The U.S. component of the NACC and the advisory council created by the U.S. NACC

Secretariat also do not furnish advice to the federal government. Judicial Watch's complaint

alleges no specific facts suggesting that either group provides formal advice or recommendations

independent of the larger NACC organization. See Nat'l Anti-Hunger Coal. v. Executive Comm.

of the President's Private Sector Survey on Cost Control, 711 F.2d 1071, 1075 (D.C. Cir. 1983),

aff'g 557 F. Supp. 524, 529 (D.D.C. 1983) (finding that task forces that advised a FACA

advisory committee but did not themselves directly advise the President or any federal agency

were not subject to FACA); cf. Ass'n of Am. Physicians & Surgeons v. Clinton, 997 F.2d 898,

913 (D.C. Cir. 1993) ("[A] group is a FACA advisory committee when it is asked to render

advice or recommendations, as a group, and not as a collection of individuals."); Kowal v. MCI

Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (noting that in evaluating a complaint,

"the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by

the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations.").

C.    **FACA does not apply to proceedings held on foreign soil under the auspices of foreign governments or foreign citizens not controlled by the U.S. Government.**

Even if Judicial Watch's interpretation of FACA were not already foreclosed by Supreme Court and D.C. Circuit precedent, other characteristics of the NACC, the U.S. component of NACC, and the U.S. NACC advisory council would preclude interpreting FACA to reach the groups. Judicial Watch urges the Court to interpret FACA as applying to dealings with foreign government ministers and foreign private citizens and meetings taking place on foreign soil. Read in this manner, the statute would impose burdens on foreign cabinet ministers, as well as on foreign private citizens who may have never visited the United States. It would further command the Commerce Department to demand compliance from foreign citizens over whom the Commerce Department has no authority. Such a reading would violate several well-established principles of statutory construction.

First, "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' This [canon] . . . . serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 284–85 (1949)), discussed in Spector v. Norwegian Cruise Line Ltd., 125 S. Ct. 2169, 2182 (2005; Small v. United States, 544 U.S. 385, 388–89 (2005). FACA contains no indication of Congressional intent to regulate the government's dealings with foreign ministries or foreign private entities or the conduct of U.S. officials on foreign soil.

In addition, applying the stringent provisions of FACA to any and all dealings with foreign governments and foreign citizens would impair the Commerce Department's ability to engage in international consultation and cooperation efforts with foreign government ministers and foreign citizens. In the absence of a clear statement, Congress should be presumed not to have intended such a drastic interference with the executive branch's conduct of foreign relations. Cf. Pub. Citizen, 491 U.S. at 465–67 (applying canon of constitutional doubt in determining that FACA did not apply to Justice Department consultations with an American Bar Association committee regarding judicial nominees); United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 319 (1936) ("In this vast external realm [of foreign relations], with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He makes treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it.").

## III.    The Court lacks subject matter jurisdiction over Judicial Watch's complaint.

### A.    Judicial Watch lacks standing, because Judicial Watch's complaint fails to establish the core elements of injury in fact, causation, and redressability.

Even if the NACC and its component groups could be considered "advisory committees" falling within the scope of the FACA, the plaintiff still could not show a likelihood of success on the merits, because Judicial Watch lacks standing.

Standing is a indispensable requirement for the Court's subject matter jurisdiction under Article III of the Constitution. See Allen v. Wright, 468 U.S. 737, 750 (1984). The "irreducible constitutional minimum" of standing requires three elements:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal

connection between the injury and the conduct complained of—the injury has to
be "fairly . . . trace[able] to the challenged action of the defendant, and not . . .
th[e] result [of] the independent action of some third party not before the court."
Third, it must be "likely," as opposed to merely "speculative," that the injury will
be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (citations omitted) (footnote

omitted) (alterations in original). Judicial Watch's complaint fails to establish any of the three

requirements of standing.

First, Judicial Watch has not alleged a judicially cognizable injury in fact. In a FACA

case, a plaintiff demonstrates injury in fact when it demonstrates that it "sought and [was] denied

specific agency records." Pub. Citizen, 491 U.S. at 449 (emphasis added). The only request

Judicial Watch describes in its complaint is a letter addressed to the Secretary of Commerce and

dated July 26, 2007, a mere 15 calendar days before the filing of this suit.[4] In the letter, Judicial

Watch requests that the Secretary "acknowledge that the NACC and its U.S. component

subcommittees are advisory committees under FACA and . . . bring their operations into

compliance with all appropriate laws and regulations"; "confirm" within eight days that the

Montebello meeting "will be open to Judicial Watch and the general public"; and "make all . . .

records of the NACC and its U.S. component subcommittees available to Judicial Watch." Pl.'s

Application Ex. 12 at 2.

Even if it could be said, based on this letter, that Judicial Watch has lodged a proper

---

[4]Judicial Watch's complaint also mentions a March 23, 2007, letter addressed the U.S.
Chamber of Commerce. Compl. ¶ 29; Pl.'s Application at 7; Pl.'s Application Ex. 10. The U.S.
Chamber of Commerce is a private-sector business organization that is not subject to the
authority or control of the Department of Commerce. See U.S. Chamber of Commerce, About
the U.S. Chamber of Commerce, http://www.uschamber.com/about/ (last visited Aug. 14, 2007).

Judicial Watch also states that it has submitted Freedom of Information Act requests to
the Commerce Department in the past, but none of those earlier requests are at issue in this case.
Compl. ¶ 28.

request under FACA seeking agency documents, it cannot be said that any such request has been denied. On the contrary, the Department of Commerce is currently handling Judicial Watch's letter as a request for documents under the Freedom of Information Act, which provides the agency twenty working days to respond. 5 U.S.C. § 552(a)(6)(A)(i). See Ex. 2 (letter to Christopher J. Farrell, Director of Research and Investigations, Judicial Watch, dated July 31, 2007). Indeed, Judicial Watch's letter specifically requested that the Department of Commerce provide the documents "pursuant to the provisions of FOIA." Pl.'s Application Ex. 12 at 2. Because Judicial Watch has not been "denied specific agency records," Pub. Citizen, 491 U.S. at 449, Judicial Watch has no injury that could support Article III standing.

Judicial Watch also cannot claim injury based on its abstract interests in open government. Such interests do not satisfy the requirement that the plaintiff assert an injury that is concrete and particularized. See Defenders of Wildlife, 504 U.S. at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998) (abstract interest in seeing "that the Nation's laws are faithfully enforced" is not sufficiently concrete to support standing).

Judicial Watch also has not satisfied the causation or redressability requirements of standing, because Judicial Watch's exclusion from NACC proceedings "results from the independent action of some third part[ies] not before the court," Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 42 (1976), and Judicial Watch has not shown that an order of relief against the Commerce Department is likely to redress any claimed injuries. As stated in Judicial Watch's

complaint, the NACC, its U.S. component, and the associated advisory council include various members not subject to the Commerce Department's authority: U.S. and foreign private citizens, businesses, and groups. The upcoming meeting will take place on foreign sovereign territory with foreign government officials present or in close proximity. An order against the Commerce Department would not ensure that these various individuals, businesses, and foreign government actors will permit Judicial Watch access to NACC records and proceedings. See Defenders of Wildlife, 504 U.S. at 562 (when the issue of justiciability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury"); Greater Tampa Chamber of Commerce v. Goldschmidt, 627 F.2d 258, 263 (D.C. Cir. 1980) (holding that a challenge against an executive agreement was not a justiciable case or controversy in part because redress of the plaintiffs' alleged injuries would depend on the independent response of the United Kingdom).[5]

In addition, even if Judicial Watch had standing to seek access to NACC records and proceedings on its own behalf, Judicial Watch still would lack standing to seek an order requiring the Commerce Department to open NACC records and proceedings to the public more

---

[5]The Court also cannot craft an order compelling the Commerce Department to request or persuade Canadian and Mexican authorities to act in a certain manner; the political question doctrine would bar such an intrusion into the executive branch's conduct of foreign relations. See Bancoult v. McNamara, 445 F.3d 427, 433 (D.C. Cir. 2006) ("'The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—"the political"—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.'" (quoting Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918))); Earth Island Inst. v. Christopher, 6 F.3d 648, 652–54 (9th Cir. 1993) (holding that the federal courts could not enforce a statute that purported to require the executive to initiate discussions with foreign countries).

generally. <u>See</u> Compl. at 13; <u>see also</u> Pl.'s Application at 13. Because the interest underlying

standing in a FACA case is the plaintiff's own personal entitlement to records, <u>see</u> <u>Pub. Citizen</u>,

491 U.S. at 449, the plaintiff's standing is confined to enforcement of that personal interest and

does not extend to enforcement of a broader public interest. <u>See</u> <u>City of Los Angeles v. Lyons</u>,

461 U.S. 95, 101–02 (1983) (Article III standing requires a concrete injury in fact personal to the

plaintiff); <u>DaimlerChrysler Corp. v. Cuno</u>, 126 S. Ct. 1854, 1867 (2006) (plaintiff must establish

standing for each individual claim and request for relief in its complaint); <u>NRDC v. Pena</u>, 147

F.3d 1012, 1021 (D.C. Cir. 1998) (holding that even though the plaintiff had standing to obtain

documents under FACA, it lacked standing to seek injunctive relief that would not redress the

injury related to the plaintiff's lack of access to the documents). Thus, even if Judicial Watch

itself had standing to seek access to NACC records and proceedings under FACA, it would still

lack standing to seek broader public access to those records and proceedings.

> **B.      Judicial Watch's request for mandatory relief lies outside the Court's statutory mandamus jurisdiction, because the request seeks an order imposing a vaguely defined continuing obligation, not a precise, definite act to which Judicial Watch is clearly entitled.**

The Court also lacks jurisdiction over Judicial Watch's request for mandamus relief,

because the relief that Judicial Watch requests is outside the scope of mandamus. The mandamus

statute, 28 U.S.C. § 1361, authorizes district court jurisdiction over actions "in the nature of

mandamus." <u>Id.</u> "Jurisdiction over actions 'in the nature of mandamus' under § 1361, like

jurisdiction over the now-abolished petitions for writs of mandamus, is strictly confined. . . .

[M]andamus is 'drastic'; it is available only in 'extraordinary situations'; it is hardly ever

granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable'

right to relief; and even if the plaintiff overcomes all these hurdles, whether mandamus relief

should issue is discretionary." <u>In re Cheney</u>, 406 F.3d 723, 729 (D.C. Cir. 2005) (directing

district court to dismiss plaintiff's requests for FACA-related mandamus relief); see also Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 63 (2004) ("The mandamus remedy was normally limited to enforcement of 'a specific, unequivocal command,' the ordering of '"a precise, definite act . . . about which [an official] had no discretion whatever."'" (citations omitted) (alteration in original)). Because mandamus jurisdiction is available only in cases where the remedy requested is in the nature of mandamus, "mandamus jurisdiction under § 1361 merges with the merits." Cheney, 406 F.3d at 729.

Judicial Watch's request for relief lies outside the Court's mandamus jurisdiction, because Judicial Watch does not seek an order compelling a single discrete act that is "precise" and "definite." So. Utah Wilderness Alliance, 542 U.S. at 63. Rather, Judicial Watch asks for a blunderbuss order that would compel the defendants in vague terms "to perform carry out [sic] all nondiscretionary duties required by FACA." Compl. at 13. The order Judicial Watch requests would not compel a one-time act, but would impose a continuing obligation governing future conduct and subject to the Court's continuing supervision. Compl. at 13. This request is not "in the nature of mandamus," so neither mandamus jurisdiction nor the mandamus remedy is available to Judicial Watch.

## IV. Judicial Watch's complaint fails to state a claim under the Administrative Procedure Act.

Judicial Watch's complaint does not state a valid claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706. FACA does not create a private right of action, so a plaintiff attempting to challenge violations of FACA must invoke a private right of action provided by some other provision of law. Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group, 219 F. Supp. 2d 20, 33 (D.D.C. 2002); see also Cheney v. U.S. Dist. Court for the D.C., 542 U.S. 367, 374–75 (2004) (reciting this holding without remark in discussing the procedural

background of the litigation). Thus, Judicial Watch's complaint attempts to enforce the FACA against the defendants through the Administrative Procedure Act or an action for mandamus.[6] Compl. ¶¶ 40–47.

The Administrative Procedure Act permits review of "final agency action." 5 U.S.C. § 704. Under some circumstances, "failure to act" may constitute final agency action, id. § 551(13), and a reviewing court can compel the unlawfully withheld action. However, every APA challenge, whether targeted at an "action" or a "failure to act," must have as its object some "circumscribed, discrete agency action[]" to be invalidated or compelled. See Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 61–63 (2004); see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 898–89 (1990) (holding that defendant was entitled to summary judgment in APA action that failed to target an "identifiable action or event").

Judicial Watch's complaint does not challenge a discrete action the defendants have taken or have not taken by a required deadline. Instead, Judicial Watch complains of a broad, continuing pattern of supposed noncompliance with the FACA statutory framework. Compl. ¶ 37. This is precisely the kind of mischief the APA's requirement of final agency action is intended to prevent. As the Supreme Court wrote in Southern Utah Wilderness Alliance:

> If courts were empowered to enter general orders compelling compliance with
> broad statutory mandates, they would necessarily be empowered, as well, to
> determine whether compliance was achieved—which would mean that it would
> ultimately become the task of the supervising court, rather than the agency, to
> work out compliance with the broad statutory mandate, injecting the judge into

---

[6]Judicial Watch's complaint also invokes the Declaratory Judgment Act, 28 U.S.C. § 2201, Compl. ¶¶ 35–39, but the Declaratory Judgment Act does not provide a cause of action; it merely authorizes a form of relief. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) ("'[T]he operation of the Declaratory Judgment Act is procedural only.'" (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937)) (alteration in original)); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 508–09 (1959) (noting that the Declaratory Judgment Act was designed to "leav[e] substantive rights unchanged").

day-to-day agency management.

542 U.S. at 66–67. See also Nat'l Wildlife Fed'n, 497 U.S. at 898–99 (holding that the APA did

not provide a vehicle for reviewing the Bureau of Land Management's alleged failure to

"provid[e] information and permit[] public participation," even assuming that the BLM was

required to provide such information and public access). Thus, the APA does not provide a

vehicle for Judicial Watch's "broad programmatic attack," So. Utah Wilderness Alliance, 542

U.S. at 64, against the Commerce Department's dealings with the NACC, its U.S. component,

and the associated advisory council. See Compl. ¶ 41 (general allegations of noncompliance not

targeted at any specific action).

**V.     Judicial Watch has not shown irreparable harm justifying the extraordinary
        intervention of interim relief.**

The sole subject of Judicial Watch's request for a temporary restraining order or

preliminary injunction is a two-day meeting in Montebello, Canada at which the NACC is

scheduled to deliver a report to U.S., Canadian, and Mexican leaders. Pl.'s Application at 2, 13;

Proposed Order. Judicial Watch complains that after the meeting has taken place, there will be

no way to turn back the clock and allow Judicial Watch to attend. However, this fact alone is not

sufficient to demonstrate irreparable harm that is "both certain and great," Wisc. Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).

According to Judicial Watch's complaint, this suit is not merely focused on participation

at the Montebello meeting, but is intended to advance a broad and continuing interest in ongoing

access to NACC records and proceedings. See Compl. at 1–2. Even if the Court were to

eventually rule in Judicial Watch's favor on the merits, exclusion from the upcoming Montebello

meeting would not work irreparable harm to this interest. If Judicial Watch were to win on the

merits, it could adequately satisfy this interest by gaining access to future NACC proceedings

and gaining access to NACC records, including any records associated with the Montebello meeting. Furthermore, even if the NACC could be viewed as an "advisory committee" subject to FACA, exclusion from the meeting would amount to irreparable harm only if the congregation of NACC members planned at the August 20–21 meeting would be subject to the open meeting requirements of FACA, 5 U.S.C. app. § 10. It is far from clear that § 10 would apply. The terms of § 10 were designed to ensure access to meetings at which members of an advisory committee will develop advice on the "identified governmental policy," <u>Judicial Watch v. Clinton</u>, 76 F.3d 1232, 1233 (D.C. Cir. 1996), that the committee was designed to address. The provision was not designed to ensure public access to any and all events where the members of the committee assemble. <u>See</u> 5 U.S.C. app. § 10(c) (requiring that detailed minutes be kept for "<u>each meeting</u> of each advisory committee" (emphasis added), including "a complete and accurate description of matters discussed and conclusions reached"). At least a portion of the upcoming Montebello meeting will be devoted exclusively to the <u>delivery</u> of recommendations that have already been developed and finalized by the NACC. Bastian Decl ¶ 19 (noting that the NACC will deliver a report to the leaders of the United States, Mexico, and Canada). Judicial Watch's application for preliminary relief makes no specific factual assertions regarding other events the NACC has scheduled in Montebello that have any connection with the Commerce Department.[7]

On the other hand, if the August 20–21 meeting in Montebello, Canada, is the sole or primary object of Judicial Watch's suit, temporary relief is inappropriate for several additional reasons. First, an order compelling defendants to allow Judicial Watch to attend the Montebello meeting would effectively grant the plaintiff the full relief Judicial Watch seeks on the merits.

---

[7]In addition, the FACA permits agencies to close meetings subject to the provisions of the Government in the Sunshine Act. 5 U.S.C. app. 2 § 10(d) (incorporating the meeting closure provisions of the Government in the Sunshine Act, 5 U.S.C. § 552b(c), by reference).

Issuance of a preliminary injunction is especially disfavored in such circumstances. See Dorfmann v. Boozer, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) ("[A] preliminary injunction should not work to give a party essentially the full relief he seeks on the merits."); Bradshaw v. Veneman, 338 F. Supp. 2d 139, 144–45 (D.D.C. 2004) ("[A] hurried resolution in favor of plaintiffs is not the purpose of temporary or preliminary injunctive relief." (citing Enercons Va., Inc. v. Am. Sec. Bank, N.A., 720 F.2d 28, 29 (D.C. Cir.1983))).

Moreover, if the Montebello meeting can be conceived of as presenting an emergency, it is an emergency occasioned entirely by Judicial Watch's delay in pursuing administrative or judicial remedies. According to Judicial Watch's complaint, the origins of the NACC date back more than two years, Compl. ¶ 9, and Judicial Watch itself has been actively monitoring the NACC for more than a year. Compl. ¶ 28. The upcoming Montebello meeting has been a matter of public knowledge since at least as early as February 23, 2007. See Pl.'s Application Ex. 9 (press release dated February 23, 2007, stating that the Security and Prosperity Partnership would conduct a meeting on "August 2007, in Canada"). But Judicial Watch did not request the Commerce Department's cooperation in gaining access to the NACC proceedings until July 26, 2007, Pl.'s Application at 7, and it did not file its complaint in this action until exactly 10 days before the August 20 meeting. Cf. Fund for Animals v. Frizzell, 530 F.2d 982, 988 (D.C. Cir. 1975) (finding that plaintiff's delay in seeking a preliminary injunction bolstered the court's conclusion that the injunction should not issue).

Also, Judicial Watch is not seeking relief that would maintain the status quo so as to preserve the court's jurisdiction over the merits of the case. Rather, Judicial Watch is seeking a mandatory injunction that would upset the status quo and compel the Commerce Department to do Judicial Watch's bidding. See Bradshaw v. Veneman, 338 F. Supp. 2d 139, 144 (D.D.C.

28

2004) ("The Court . . . must consider the fact that plaintiffs are not asking the Court to maintain the <u>status quo</u> by preventing the defendants from taking some action.").

Finally, issuance of the requested relief will not necessarily prevent Judicial Watch from being excluded from NACC proceedings, because the NACC's meetings are not controlled by the Commerce Department. Judicial Watch cannot seek interim relief based on harm that will occur even in the absence of interim relief. <u>See</u> <u>People for the Ethical Treatment of Animals, Inc. v. Barshefsky</u>, 925 F. Supp. 844, 849 & n.3 (D.D.C. 1996) (finding, in a suit targeting an international working group meeting in St. Petersburg, Russia, that the plaintiff failed to satisfy the irreparable harm criterion in part because the court could not prevent foreign delegations from excluding the plaintiff from the meeting); <u>see also</u> <u>id.</u> at 849 ("[E]ven if this court were to impose the Act's requirements upon the meeting, it could not force the delegations of the other participating countries to comply with the same.").

The plaintiff cites two district court cases, <u>Gates v. Schlesinger</u>, 366 F. Supp. 797 (D.D.C. 1973) and <u>Public Citizen v. National Economic Commission</u>, 703 F. Supp. 113 (D.D.C. 1989), in which courts found that the harm of exclusion from a meeting justified entry of preliminary relief. Those two cases, however, both dealt with groups that the parties agreed were subject to FACA. The dispute in each case centered around readily resolvable questions regarding the applicability of exemptions to the FACA and its open meeting requirements. <u>See</u> <u>Gates</u>, 366 F. Supp. at 798; <u>Pub. Citizen v. Nat'l Econ. Comm'n</u>, 703 F. Supp. at 125. Thus, the plaintiffs in those cases had made much stronger showings of a likelihood of success on the merits. Also, the two cases cited by Judicial Watch both involved meetings of domestic groups, but as explained above, the meeting at issue in this case will take place on Canadian soil and will involve delegations from at least three different countries, so it is far from clear that an order

against the Secretary and the Department of Commerce would be sufficient to allow Judicial Watch to attend the August 20–21 meeting.

**VI.     A grant of interim relief would harm other parties and would harm the public interest.**

Judicial Watch has also not established—or even made a genuine attempt to establish—the third and fourth requirements in the analysis governing the grant of temporary relief. The relief Judicial Watch requests would harm defendants and third parties not present in the litigation, and it would harm the public interest.

In support of a grant of temporary relief, Judicial Watch offers nothing more than a bare assertion that no harm will be done by an entry of temporary relief because no harm can ensue from merely forcing defendants to comply with the law. Pl.'s Application at 12, 13. That assumes that Judicial Watch is entitled to relief on the merits. In fact, as the defendants have already shown, Judicial Watch is not entitled to relief on the merits, and it has made no showing of a likelihood of success on the merits. Entry of the requested relief will in fact harm the defendants by interfering with the Commerce Department's interactions with foreign governments and foreign citizens and the President's conduct of foreign relations, in particular his interactions with foreign leaders. See Adams v. Vance, 570 F.2d 950, 954–55 (D.C. Cir. 1978) (holding that even assuming that the plaintiff's request for an injunction interfering with the executive branch's conduct of foreign affairs presented a justiciable controversy, the plaintiff failed to make the "extrordinarily strong showing" that would be required to justify the issuance of such relief). Moreover, an order governing how Commerce Department officials and employees conduct themselves on Canadian soil, in the presence of or in proximity to Canadian and Mexican government leaders and citizens, will at the very least lead to friction in relations among the three states, and in the worst case could interfere with security arrangements that may

have been made for the meeting in light of the presence of high-level government officials.

For the same reasons, a grant of interim relief would harm the public interest. Judicial Watch's assertion that the public interest would be served by forcing compliance with FACA again assumes, incorrectly, that FACA applies and that Judicial Watch is entitled to relief on the merits.

## <u>CONCLUSION</u>

For the reasons above, the Department of Commerce and the Secretary of Commerce respectfully request that the Court deny Judicial Watch's application for a temporary restraining order or preliminary injunction.

Dated: August 15, 2007                                Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Branch Director

/s/ <u>JAMES C. LUH</u>
JAMES C. LUH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460
E-mail: James.Luh@usdoj.gov
Attorneys for Defendants

Civil Action No. 07-cv-1446 (PLF)

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.                                )
501 School Street, SW, Suite 500                    )
Washington, D.C.  20024                             )
                                                    )
            Plaintiff,                              )
                                                    )
v.                                                  )     Civil Action No. 07-cv-1446 (PLF)
                                                    )
U.S. DEPARTMENT OF COMMERCE,                        )
14th Street and Constitution Avenue, N.W.           )
Washington, D.C.  20230,                            )
                                                    )
and                                                 )
                                                    )
CARLOS GUTIERREZ, in his official capacity          )
as Secretary of the U.S. Department of Commerce,    )
14th Street and Constitution Avenue, N.W.           )
Washington, D.C.  20230,                            )
                                                    )
            Defendants.                             )
_____ )

## DECLARATION OF WALTER M. BASTIAN

I, Walter M. Bastian, hereby declare as follows:

1.  I am Deputy Assistant Secretary for the Western Hemisphere, within Market Access and

Compliance, of the International Trade Administration, U.S. Department of Commerce (the

"Department").  I have served in my current capacity since January 2002.  My responsibilities for

the Western Hemisphere include overseeing implementation of the SPP prosperity working

groups for the U.S. Department of Commerce.  I make this declaration based upon my personal

knowledge of the contents herein.

1

Creation of the NACC

2. On March 23, 2005, the President of the United States, the Prime Minister of Canada, and the President of Mexico (collectively referred to as the Leaders) met in Waco, Texas, and launched the Security and Prosperity Partnership of North America (SPP), which is aimed at increasing security and enhancing the prosperity of the three countries through greater cooperation. Attach. 1. The SPP was developed as a cooperative effort by the three governments and, as detailed in a June 23, 2005 Report to Leaders from the SPP Ministers,[1] consists of numerous subjects of mutual interest between and among the United States, Mexico, and Canada in areas as diverse as the movement of goods, traveler security, energy, environment, and health. (See Attach. 2).

3. The Annex to the June 23, 2005 Report to Leaders included an initiative to "[w]ork to more effectively identify and respond to factors affecting the competitiveness of the North American economy." Attach. 3.

4. In mid to late 2005, to address this initiative, one idea discussed trilaterally at the working level was the concept of encouraging greater input from the private sector on ways to enhance North American competitiveness.

5. In preparation for the March 2006 Leaders' Meeting, the three governments discussed at the coordinator's level the concept of establishing a private sector led and driven trilateral group that would focus on competitiveness. Subsequently, the coordinators from the three governments drafted a trilaterally-agreed concept paper. Att. 4.

---

[1] The SPP Ministers are the United States Secretaries of Commerce, State, and Homeland Security, and their Mexican and Canadian government counterparts. Of those, the Secretary of Commerce and his Mexican and Canadian government counterparts are referred to as the SPP Prosperity Ministers.

6. On March 15, 2006, the Council of the Americas (the Council) and the U.S. Chamber of

Commerce (the Chamber) hosted a meeting of U.S., Mexican, and Canadian business leaders

with U.S. Secretary of Commerce Carlos M. Gutierrez (the Secretary) and representatives from

the governments of Mexico and Canada to discuss North American competitiveness and the

private sector's interest in the concept of a trilateral private sector entity. The Secretary provided

opening remarks for this meeting. The private sector was very enthusiastic regarding the

concept. The Chamber and the Council offered to act as the U.S. Secretariat of such an entity.

7. The Leaders of the three countries met on March 31, 2006 in Cancun, Mexico where they

announced the creation of a tri-lateral private sector led and driven council that "will comprise

members of the private sector from each country and will provide us with recommendations on

North American competitiveness, including, among others, areas such as automotive and

transportation, steel, manufacturing, and services." Attach. 5. That council is the North

American Competitiveness Council (NACC).

8. The purpose of the NACC is to "[i]ncreas[e] private sector engagement in the SPP by adding

high-level business input [to] assist governments in enhancing North America's competitive

position and engage the private sector as partners in finding solutions. The [NACC] will:

- Consider issues that could be addressed trilaterally or bilaterally, as

   improvements in our bilateral relationships enhance North American

   competitiveness.

- Address issues of immediate importance and provide strategic medium

   and long-term advice.

- Provide input on the compatibility of our security and prosperity agendas,

3

given the linkages between security and prosperity in a global marketplace.

- Offer ideas on the private sector's role in promoting North American competitiveness."

Attach. 6.

9. On June 15, 2006, the Secretary along with his government counterparts from Mexico and Canada (collectively referred to as the SPP Prosperity Ministers) met with private sector representatives from all three countries in Washington, D.C., where the NACC was launched. Attach. 7.

How the NACC Works

10. The NACC currently consists of 30 private sector business leaders (10 from each country) that participate in meetings with SPP Ministers or Leaders. Pl's. Ex. 5. Each country's NACC component is supported by a Secretariat from that country. In the case of the U.S. component, the Chamber and the Council jointly serve as the Secretariat. See Attach. 8, linked at www.uschamber.com/issues/index/international/nacc.htm follow link to Secretariats.

11. In the case of the U.S. component, as discussed below, the members were selected by the Chamber and the Council and not by the U.S. Government.

12. The Chamber and the Council hosted a meeting with U.S. business leaders on May 26, 2006. The Secretary of Commerce's only participation was to provide opening remarks and answer a few questions related to the SPP, and then he departed. After the Secretary's departure, the Chamber and the Council solicited nominations for the U.S. members. No U.S. Government officials participated in the nominations of members.

13. Subsequent to the May 26, 2006 meeting, and prior to the June 15, 2006 SPP Ministers'

4

meeting, the Chamber and the Council selected a pool of 15 member companies for the U.S. component of the NACC. No U.S. Government official had any role in the selection decisions.

14. The Chamber and the Council also established a U.S. advisory council to the U.S. component. According to the Chamber's and the Council's websites, the advisory council consists of approximately 200 members. See The Chamber and the Council set the parameters for participating in this group. No U.S. Government official had any role in establishing this advisory council or has ever attempted to manage this group.

15. Since the launch of the NACC, the U.S. Government has never exerted management or control over the NACC. The U.S. component of the NACC is organized by and for the U.S. business community through the Chamber and the Council. The U.S. Government has never funded the NACC, appointed the members, scheduled meetings, set meeting agendas, or participated in developing the final product(s) of the NACC. With respect to the U.S. component, the Chamber and the Council have performed all these functions without any input from U.S. Government officials.

16. The Secretariats from the three countries coordinate the NACC schedule, set NACC meetings, set the agendas for such meetings, and coordinate and finalize products of the NACC. The Chamber and the Council (and not the U.S. Government) set the rules for the U.S. component of the NACC, including all procedural rules.

17. Since the announcement of the NACC in March 2006, the NACC has met with the SPP Prosperity Ministers (Secretary Gutierrez and his government counterparts in Canada and Mexico) three times: June 15, 2006 at the launch of the NACC; February 23, 2007 at a Ministerial Meeting; and June 2007 in Atlanta, Georgia, on the margins of the Americas

Competitiveness Forum (at which only the NACC Secretariats met with the SPP Prosperity

Ministers). The NACC has provided only one report so far to the SPP Ministers (including the

Prosperity Ministers and Secretaries Rice and Chertoff and their Mexican and Canadian

government counterparts) at the February 23, 2007 meeting. NACC recommendations are

provided to the trilateral SPP.

Upcoming SPP Meeting

18. On February 23, 2007, the Department issued a press release which was made available on

the Department's internet website at www.spp.gov, to discuss the results of that day's trilateral

SPP Ministers' Meeting in Ottawa, Canada at which the NACC presented a 63 page report of

recommendations to the Ministers (the report is available to the public through the Chamber's

and the Council's websites). The February 23rd press release announced that the next SPP

Leaders' meeting would take place in August 2007. See Pl's Ex. 9.

19. As part of the SPP Leaders' Meeting on August 20-21, 2007 in Montebello, Canada, the

Leaders and the SPP Ministers have a scheduled meeting with the NACC for the NACC to

provide a report to the Leaders.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 15,

2007, in the District of Columbia.

Walter M. Bastian

6

# ATTACHMENT 1

Joint Statement by President Bush, President Fox, and Prime Minister Martin



# THE WHITE HOUSE

PRESIDENT GEORGE W. BUSH

PRESIDENT | VICE PRESIDENT | FIRST LADY | MRS. CHENEY | NEWS

Your Government | History & Tours | Kids | E-mail | En Español

Search

Podcasts        RSS Feeds

Home > News & Policies > March 2005

🖨 Printer-Friendly Version    ✉ Email This Page

For Immediate Release
Office of the Press Secretary
March 23, 2005



## Joint Statement by President Bush, President Fox, and Prime Minister Martin

Joint Statement by President Bush, President Fox, and Prime Minister Martin

Security and Prosperity Partnership of North America

We, the elected leaders of Canada, Mexico, and the United States, gather in Texas to announce the establishment of the Security and Prosperity Partnership of North America.

Over the past decade, our three nations have taken important steps to expand economic opportunity for our people and to create the most vibrant and dynamic trade relationship in the world. Since September 11, 2001, we have also taken significant new steps to address the threat of terrorism and to enhance the security of our people.

But more needs to be done. In a rapidly changing world, we must develop new avenues of cooperation that will make our open societies safer and more secure, our businesses more competitive, and our economies more resilient.

Our Partnership will accomplish these objectives through a trilateral effort to increase the security, prosperity, and quality of life of our citizens. This work will be based on the principle that our security and prosperity are mutually dependent and complementary, and will reflect our shared belief in freedom, economic opportunity, and strong democratic values and institutions. Also, it will help consolidate our action into a North

**⚹ IN FOCUS**

Budget Management
Defense
Economy
Education
Energy
Environment
Gulf Coast
Health Care
Homeland Security
Immigration
Iraq
Judicial Nominations
Medicare
National Security
Pandemic Flu
Patriot Act
Veterans

more issues ⊕

**News**

Current News
Press Briefings
Proclamations
Executive Orders
Radio

more news ⊕

News by Date

August 2007

Joint Statement by President Bush, President Fox, and Prime Minister Martin

July 2007
June 2007
May 2007
April 2007
March 2007
February 2007
January 2007
2006
December 2005
November 2005
October 2005
September 2005
August 2005
July 2005
June 2005
May 2005
April 2005
March 2005
February 2005
January 2005
2004
2003
2002
2001

Appointments

Nominations
Applications

Federal Facts

Federal Statistics

West Wing

History

American framework to confront security and economic challenges, and promote the full potential of our people, addressing disparities and increasing opportunities for all.

Our Partnership is committed to reach the highest results to advance the security and well-being of our people. The Partnership is trilateral in concept, while allowing any two countries to move forward on an issue, it will create a path for the third to join later.

Advancing our Common Security

We will establish a common approach to security to protect North America from external threats, prevent and respond to threats within North America, and further streamline the secure and efficient movement of legitimate, low-risk traffic across our shared borders. As part of our efforts, we will:

- Implement common border security and bioprotection strategies;

- Enhance critical infrastructure protection, and implement a common approach to emergency response;

- Implement improvements in aviation and maritime security, combat transnational threats, and enhance intelligence partnerships; and

- Implement a border facilitation strategy to build capacity and improve the legitimate flow of people and cargo at our shared borders.

Advancing our Common Prosperity

We will work to enhance North American competitiveness and improve the quality of life of our people. Among other things, we will:

- Improve productivity through regulatory cooperation to generate growth, while maintaining high standards for health and safety;

- Promote sectoral collaboration in energy, transportation, financial services, technology, and other areas to facilitate business; and invest in our people;

- Reduce the costs of trade through the efficient movement of goods and people; and

- Enhance the stewardship of our environment, create a safer and more reliable food supply while facilitating agricultural trade, and protect our people from disease.



Next Steps

We will establish Ministerial-led working groups that will consult with stakeholders in our respective countries. These working groups will respond to the priorities of our people and our businesses, and will set specific, measurable, and achievable goals. They will identify concrete steps that our governments can take to meet these goals, and set implementation dates that will permit a rolling harvest of accomplishments.

Within 90 days, Ministers will report back to us with their initial report. Following this, the groups will report on a semi-annual basis. Because the Partnership will be an ongoing process of cooperation, new items will be added to the work agenda by mutual agreement as circumstances warrant.

Through this Partnership, we will ensure that North America remains the most economically dynamic region of the world and a secure home for our people in this and future generations.

# # #

🖨 Printer-Friendly Version    ✉ Email This Page

President | Vice President | First Lady | Mrs. Cheney | News & Policies

History & Tours | Kids | Your Government | Appointments | Jobs | Contact | Text only

Accessibility | Search | Privacy Policy | Help | Site Map

# ATTACHMENT 2



SPP.Gov >> Report To Leaders : Report to Leaders

**Report to Leaders**
**Security and Prosperity Partnership Of North America**

**Publication Date:** June 27, 2005

**Security and Prosperity Partnership of North America**

**Report to Leaders**

**June 2005**

On March 23, 2005, you announced the Security and Prosperity Partnership of North America. At that time, you instructed Ministers to create an architecture which would further enhance the security of North America while at the same time promote the economic well-being of our citizens and position North America to face and meet future challenges. This effort builds on the excellent, long-standing relations among our three countries. The response to your request is attached.

In carrying out your instructions, we established working groups under both agendas of the Partnership – Security and Prosperity. We held roundtables with stakeholders, meetings with business groups and briefing sessions with legislatures, as well as with other relevant political jurisdictions. The result is a detailed series of actions and recommendations designed to increase the competitiveness of North America and the security of our people. While the Security and Prosperity agendas were developed by separate teams, we recognize that our economic well-being and our security are not two separate and distinct issues. In that spirit, we have worked together to ensure that the appropriate linkages are made between security and prosperity initiatives.

Upon your review and approval, we will once again meet with stakeholders and work with them to implement the workplans that we have developed. We will also encourage them to continue to provide us with new ideas and proposals which will help shape our forward agenda and our vision for North America.

To make North America secure for the future, we need integrated, coordinated and seamless measures in place at, within, and beyond our borders to provide our people and our infrastructure with the highest possible common level of protection from terrorists and other criminal elements, as well as from the common threats of nature.

To make North America prosperous for the future, we need to improve the efficiency of the movement of people, goods and services crossing our borders. We must remove barriers to trade, investment, research and education. We must protect our environment and promote the health and safety of our people.

Increased economic integration and security cooperation will further a unique and strong North American relationship - a relationship that meets your stated goals while preserving our political and cultural identities.

We recognize that this Partnership is designed to be a dynamic, permanent process and that the attached workplans are but a first step. We know that after today, the real work begins. We will now need to transform

the ideas into reality and the initiatives into prosperity and security.

The success of our efforts will be defined less by the contents of the workplans than by the actual implementation of initiatives and strategies that will make North America more prosperous and more secure. We will report back to you semi-annually, highlighting progress on implementing our commitments and making recommendations for further initiatives to be pursued under the Security and Prosperity Partnership.

The report is presented in three separate sections. The first outlines several initiatives which were concluded during the preparation of this report. They represent an immediate benefit from this process. The second section outlines major themes and initiatives which focus on issues or situations which, when resolved, will provide major contributions to the economic and security integrity of the region. Finally, the last section is an annex which provides a description of all the initiatives that will be undertaken by the working groups, including a description of the project, milestones and completion dates.

Much has been accomplished in the preparation of this report. We want to commend the work of each of the working group chairs and working group participants for their creativity and their ability to work as a cohesive team with their colleagues from the other countries. We believe that if the dedication and hard work shown to date are carried forward, this Partnership can only succeed in providing the security necessary to develop a strong North American platform highlighted by sustained economic growth and job creation, and improved standards of living for our citizens.

| Carlos Gutierrez | Michael Chertoff | Condoleezza Rice | Fernando Canales | Carlos Abascal | Luis Ernesto Derbéz |
|---|---|---|---|---|---|
| Secretary of Commerce | Secretary of Homeland Security | Secretary of State | Secretario de Economía | Secretario de Gobernación | Secretario de Relaciones Exteriores |
| David L. Emerson | Anne McLellan | Pierre Stewart Pettigrew | | | |
| Minister of Industry | Deputy Prime Minister and Minister of Public Safety and Emergency Preparedness | Minister of Foreign Affairs | | | |

## Security and Prosperity Partnership of North America

### Initial Results

In the 90 days since the launch of the Security and Prosperity Partnership on March 23, 2005, a number of collaborative initiatives have been completed to advance the prosperity and security agendas:

**Prosperity**

• *Electronic Commerce* . In June 2005, our three countries signed a Framework of Common Principles for

Electronic Commerce that will encourage the development of trans-border online business in North America . The Framework addresses the respective roles of government and the private sector, promoting transparency and security, and facilitating the acceleration of ICT use by eliminating barriers to e-commerce in cross-border transactions.

- *Liberalization of Rules of Origin* . We have completed the implementation of modifications of rules of origin, covering goods such as household appliances, precious metals, and various machinery and equipment parts. Liberalizing rules of origin reduces administrative burdens by making it easier for exporters to qualify for duty-free treatment under NAFTA. These changes will affect US$20 billion of annual trilateral trade.

- *Consumer Products* . Canada and the United States signed a Memorandum of Understanding to enhance and strengthen the exchange of information and cooperative activities on public health and safety protection related to the safety of consumer products, and encourage compatibility of standards-related measures to the greatest extent practicable. Likewise, Mexico and the United States are holding negotiations to reach agreement on a similar Memorandum of Understanding.

- *Textiles and Apparel Labelling* . We have reached an arrangement on the Use of Care Symbols on Textile and Apparel Goods Labels that will facilitate market access of textile and apparel goods by the uniform acceptance of harmonized care symbols in North America. We plan to sign this arrangement in July.

- *Temporary Work Entry* . The three countries have forwarded a trilateral document setting out each country's domestic procedures to modify NAFTA's temporary entry appendix on professionals to the NAFTA Free Trade Commission for approval. This will clarify procedures in each country, thereby providing a mechanism for more North American professionals to be given temporary entry.

- *Migratory Species and Biodiversity* . We have signed a Declaration of Intent for the Conservation of North American Birds and Their Habitat, a non-binding trilateral agreement to cooperate in conserving the continent's bird species and the landscapes upon which they depend for survival.

- *Harmonized Approach to BSE*. A harmonized North America approach to Bovine Spongiform Encephalopathy (BSE) was agreed by animal health officials in all three countries in March 2005. This approach provides continued protection of human and animal health, while also establishing a framework for safe international trade opportunities for cattle and beef products from Canada, Mexico and the United States.

- *Border Flow Analysis* . Canada has completed the pilot projects to test Weigh-In-Motion (WIM) technology at Canada-U.S. border crossings and will pursue broader implementation. This initiative will take advantage of state-of-the-art technology to capture, analyze and exchange traffic flow data without impeding border trade, thus enhancing transportation flexibility and efficiency.

- *Aviation Safety* . Following on the tri-lateral agreement to create a North American Wide Area Augmentation System (WAAS) signed in 2004, five WAAS stations will be put in place in Canada and Mexico in 2005. This system, based on the U.S. Global Positioning System, will increase navigational accuracy across North America, enhancing aviation safety.

- *Airspace Capacity* . The three countries implemented Reduced Vertical Separation Minimum (RVSM) in January 2005. This initiative increases North America airspace capacity and allows aircraft to fly more efficient routes, reducing costs to air carriers and passengers.

- *Harmonized Air Navigation Systems* . Our three countries recently released a North American Aviation Trilateral Statement on a Joint Strategy for the implementation of performance-based navigation in North America. This initiative, which includes both Area Navigation (RNAV) and Required Navigation Performance (RNP) in North America, will harmonize our navigation standards, simplify training and improve efficiency for air carriers.

## Security

- *NTC-NRAC Exchange.* The United States and Canada have agreed to exchange officers between their two respective targeting facilities, the National Targeting Center (NTC) in the United States and the National Risk Assessment Centre (NRAC) in Canada.

- *Public Safety along the U.S.-Mexico Border.* The United States and Mexico recently agreed to, over the course of three weeks, identify and target key procedures and guidelines to establish a standardized Alien Smuggler Prosecutions Program along the Southwest border, built upon previous U.S. – Mexico efforts in the Guide Identification Prosecution Program (GIPP), a collaborative effort between CBP and Mexico's Attorney General Office--Procuraduria General de la Republica (PGR) - to identify and prosecute local guides and alien smugglers who endanger the lives of migrants.

- *Progress on Windsor–Detroit 25% Challenge.* We are working with bridge and tunnel operators of the Detroit-Windsor gateway to develop a number of innovations that will reduce the transit times along the Detroit-Windsor corridor. On June 9, 2005, agreements were reached that are expected to increase capacity on the U.S. side of the Blue Water Bridge by 17 per cent. Improvements at the Detroit-Windsor gateway are planned for Summer/Fall 2005.

- *Expanding Infrastructure at Nogales, Arizona.* We have completed the reviews necessary to approve construction of two new commercial lanes at Nogales, Arizona. The formal documentation is expected to be issued by the end of June 2005. Construction is expected to begin shortly thereafter.

- *Science & Technology Cooperation.* The Canada–U.S. Public Security Technical Program has completed a comprehensive Coordinated Risk Assessment to form the basis for identifying and prioritizing major collaborative science and technology initiatives across all homeland security mission areas. The final report is expected to be completed in late summer 2005.

- *Nexus Marine Pilot.* The United States and Canada implemented the NEXUS-Marine pilot in Windsor–Detroit for seasonal boaters in April 2005.

- *Preclearance Site.* We have identified the site for the second Canada–U.S. land preclearance pilot: at the Thousand Islands Bridge, all Canadian border operations would be re-located from Lansdowne, Ontario to Alexandria Bay, New York.

- *WCO Framework.* We have agreed to trilaterally support, and to each promote implementation, assuming a favorable vote, of the proposed WCO Framework of Standards to Secure and Facilitate Global Trade.

- *Joint Initial Verification Team Examinations .* By the end of May 2005, the U.S. Coast Guard (USCG) - Transport Canada Joint Initial Verification Team (JIVT) had completed 94 joint verification exams , since the start of the 2005 Seaway season . The Team jointly examined vessels to ensure they were in substantial compliance with the International Ship and Port Facility Security Code regulations before they were allowed to enter the St. Lawrence Seaway and the Great Lakes .

- *Port Security Exercises.* Between May 9-11, 2005, the United States and Canada conducted three port security exercises to evaluate joint response capability to terrorist attacks along the U.S. / Canadian border of the Great Lakes between Sault Ste. Marie and Detroit.

**Promoting Growth, Competitiveness and Quality of Life**

**Key Themes and Initiatives**

On March 23, 2005, President Bush, President Fox and Prime Minister Martin committed our countries to enhancing North American competitiveness and improving the quality of life of our people. On that basis they tasked Ministers and officials, in consultation with stakeholders, to develop workplans that would give effect to that fundamental goal.

Over the past 90 days, ten working groups have been created to develop detailed workplans on prosperity and quality of life, identifying concrete, forward-looking strategies and initiatives. These initiatives form a broad and ambitious agenda of collaboration aimed at transforming important sectors of our economies and ensuring that our citizens benefit from high standards of safety and health, and joint stewardship of our environment.

## I. Making North America the Best Place to do Business

The competitiveness of North American firms depends on a number of factors influencing the business environment. The three countries have identified key drivers of competitiveness and have agreed on the following priorities:

### Enhancing and Streamlining Regulatory Processes in North America

• We will develop a trilateral Regulatory Cooperation Framework by 2007 to support and enhance existing, as well as encourage new cooperation among regulators, including at the outset of the regulatory process.

• The framework will aim to strengthen cooperation among regulators and encourage the compatibility of regulations and the reduction of redundant testing and certification requirements, while maintaining high standards of health and safety.

### Fake Free North America

• Protection of intellectual property is key to sustaining an innovative economy. We will seek to develop a coordinated strategy by 2006, aimed at combating counterfeiting and piracy, and focusing on:

• Enhancing detection and deterrence of counterfeiting and piracy;

• Expanding public awareness and outreach efforts regarding trade in pirated and counterfeit goods; and,

• Developing measurements to assess progress over time and to estimate the magnitude of the problem.

### Expanding Duty Free Treatment by Liberalizing the Rules of Origin

• Ongoing liberalization of rules of origin will help improve the competitiveness of our industries by reducing transaction costs and facilitating cross-border trade in goods. Building on the work of our three countries in implementing changes to rules of origin agreed under the first round of negotiations, we have agreed to a second round of changes and commit to complete negotiations on an ambitious third round of changes by May 1, 2006. This will expand duty free treatment through rules of origin liberalization, covering at least $30 billion in trilateral trade by 2007.

## II. Sectoral Collaboration to Enhance North American Competitiveness

We are committed to continue working to identify the factors affecting the competitiveness of the North American economy. To help Governments identify these issues, we will build on the work of existing organizations, which will provide strategic advice on ways to strengthen the North American economy in areas such as improving the flow of people and goods, supply chains and regulatory cooperation. While the efforts will be private sector led, governments, policy experts and other stakeholders will also participate.

Many sectors of our economies are already well integrated and provide valuable lessons for other sectors of the

North American economy. We believe that we can learn from these industries and work with them to ensure that they continue to thrive in the global economy. In that context, we will pursue a number of sectoral initiatives, including:

**Steel: A Strategic Partnership – A Strategic Industry**

• We will put in place a North American Steel Strategy by 2006 that will promote growth, competitiveness and prosperity. The strategy will be developed and implemented through the North American Steel Trade Committee (NASTC), which has been a leading example of sectoral cooperation among the three governments and industry. The NASTC will focus on:

• Pursuing the elimination of distortions adversely affecting North American steel markets, including through policy coordination and other actions;

• Reducing the costs and risks of North American steel trade through proactive measures to facilitate such trade, with improved monitoring to enhance understanding of the North American steel market; and

• Promoting steel industry competitiveness and productivity through innovation and market development.

**Moving towards a Fully Integrated Auto Sector**

• We will also establish an Automotive Partnership Council of North America that will support the ongoing competitiveness of the automotive and auto parts sector. The Council will help identify the full spectrum of issues that impact the industry, ranging from regulation, innovation, transportation infrastructure, and border facilitation.

**Creating a Sustainable Energy Economy for North America**

• Creating a sustainable energy economy for North America is in the vital interest of all three countries. Reliable, affordable energy is critical to the prosperity and security of our peoples. We are taking action to create a policy environment that will promote the sustainable supply and use of energy in North America.

• To that end, we affirm our commitment in pursuing joint cooperation in the areas of: regulation , energy efficiency, natural gas including liquefied natural gas (LNG), science and technology, reliability of electricity transmission grids, oil sands production, nuclear energy, hydrocarbons and energy information, statistics and projections.

• Recognizing the importance of natural gas to North America's energy future, we are announcing a trilateral gas initiative to address a range of issues related to the natural gas market in North America, including: production, transportation, transmission, distribution, consumption, trade, interconnections and LNG as well as projections for the future. This initiative also focuses on transparency of regulations, laws and siting processes in the three countries to promote enhanced regional trade and investment.

• The three countries have established a regulators' expert group, recognizing that appropriate coordination of their efforts will promote the public interest through increased efficiency, expedited and coordinated action on significant energy infrastructure projects, and cost savings to both the public and regulated entities. All agree that the regulatory efforts of the Canada's National Energy Board (NEB), the U.S. Federal Energy Regulatory Commission (FERC) and Mexico's Comision Reguladora de Energia (CRE) will benefit from increased communication and cooperation concerning the timing and other procedural aspects of related matters that may be pending before all three agencies.

• Canada and the United States have established a working group on electricity reliability which will coordinate their guidance to the North American Electricity Reliability Council (NERC) and regional councils, concerning an

Electricity Reliability Organization (ERO) that can operate on an international basis. Mexico will take initial steps to join this Working Group, with the goal of a coordinated trilateral North American reliability effort.

• The three countries will strengthen technical and scientific cooperation in the field of energy that includes initiatives to promote cleaner and more efficient energy resources and technologies.

**Air Transportation: Expanding our Horizons**

• We will put in place a plan by 2007 aimed at improving the safety and efficiency of North American air navigation system and expanding air transportation opportunities. Our aim is to reach agreement on new opportunities for commercial aviation, have a compatible regulatory regime to facilitate business aviation among all three countries, increase air capacity and enhance aviation safety and air navigation.

• The United States and Mexico will work toward the development of a Bilateral Aviation Safety Agreement. The United States will support Mexico's efforts to strengthen its oversight of Mexican companies that produce parts and components for the aerospace industry. With this purpose, and at the demonstration of sufficient production surveillance, Mexico and the United States will sign a Memorandum of Cooperation (MOC) for production oversight support. This MOC would be the first concrete step toward the eventual conclusion of a Bilateral Aviation Safety Agreement, under which certain Mexican aeronautical parts and products would be eligible for export to the United States, which will benefit Mexican industry.

**Safer, Faster and More Efficient Border Crossings**

• New, enhanced mechanisms will support binational border planning, information sharing and communications through the U.S.-Canada Transportation Border Working Group and the U.S.-Mexico Joint Working Committee on Transportation Planning. The United States and Canada will complete a border infrastructure compendium and develop an implementation plan for priority infrastructure investments at key land border ports of entry, improve border trade and traffic information, improve the cross-border movement of people and goods, enhance use of supporting technologies and improve border transportation planning and coordination. Methods for detecting bottlenecks on the U.S.-Mexico border will be developed and low cost/high impact projects identified in bottleneck studies will be constructed or implemented. New, secure SENTRI travel lanes will be constructed by 2006 and the United States and Mexico will work toward implementation of a secure cross-border commuter service between El Paso and Ciudad Juárez.

**Free and Secure Electronic Commerce**

• In June 2005, our three countries signed a Framework of Common Principles for Electronic Commerce. The Framework will promote the growth of online business and streamline transborder electronic commerce procedures while building consumer confidence through privacy protection, and a shared approach to cross-border recognition of electronic signatures and documents. We will begin to work together immediately to implement the Framework.

Beyond these sectoral initiatives, we propose to pay particular attention to the important role that small- and medium-sized enterprises (SME) play in driving innovation, job creation and economic growth. We will consult with SME stakeholders on ways of addressing their particular challenges with respect to streamlining the movement of low-risk traffic across our borders, regulatory cooperation and the reduction of paper burden.

**Enabling Our People**

• To better prepare our people to deal with the challenges of the knowledge-based economy, the three countries will, by mid 2006, better coordinate and enhance the current efforts under the Partnership for Prosperity and the Canada-Mexico Partnership. The aim of this initiative is to empower our people through enhanced higher

education , academic exchanges , and common research and development initiatives, so as to better prepare our human capital for the future.

### III. Making North America the Best Place to Live

To make North America the best place to live, our countries will implement a series of measures that will enhance the quality of our environment, ensure high standards of safety for our food supply and promote and protect the health of our citizens. Specifically, we are committing to pursue the following:

**Clean Air, Clean Water: Protecting People and our Environment .**

• Our three countries will work together to:

• Increase domestic supply of low-sulphur fuels in Mexico, through significant investment by Mexico, supported by technical assistance and capacity-building from the U.S. and Canada.

• Address ship-source air pollution through coordinated data gathering, marine emissions inventory development, and air quality modeling.

• Launch the joint Canada–U.S. review of the Great Lakes Water Quality Agreement.

• Promote ballast water management strategies in North America, demonstrating our collective commitment to combat invasive alien species.

• Seek to conclude a trans-boundary environmental impact assessment cooperation agreement for proposed projects by June 2007.

**Access to a Safe and Reliable Food Supply**

• We will establish or identify a North American food safety coordinating mechanism to facilitate the:

• Cooperative design and development of common standards, where appropriate;

• Review of existing food safety standards to identify and assess, on a scientific basis, differences with a view to removing, where warranted and appropriate, those identified differences; and,

• Sharing of information on food safety matters to protect and advance public health in North America.

• We will cooperate on a North American basis to speed up identification, management and recovery from food safety, animal and plant disease hazards.

**Healthier North America**

• We will work on many fronts to ensure a coordinated and strategic approach to address common public health issues and concerns. We will work together to improve mechanisms to share information, build on each others' knowledge and expertise, and improve capacity and cooperation by:

• Putting in place protocols for mutual assistance and support to prevent, protect against, and respond to cross-border public health emergencies. These protocols will facilitate the exchange of liaison officers between national public health agencies, and the coordination and exchange of personnel and medical supplies.

• Developing a regional plan to combat influenza, through the Global Health Security Initiative, that will facilitate the sharing of information (e.g., vaccine clinical trials) and the coordination of approaches to common regional issues related to preparedness (e.g., border issues).

• Building upon existing laboratory-based surveillance initiatives in North America by finalizing the Canada–US

Memorandum of Understanding related to PulseNet, examining methods to improve the monitoring of pathogens and establishing an infectious disease early warning system.

• Establishing a North American mechanism to facilitate information-sharing on the safety of pharmaceutical products to protect and advance public health in North America.

## Securing North America from External and Internal Threats and further Streamlining the Secure Movement of Low-Risk Traffic across our Shared Borders

### Key Themes and Initiatives

President Bush, President Fox and Prime Minister Martin committed our countries on March 23, 2005, to:

"establish a common approach to security to protect North America from external threats, prevent and respond to threats within North American, and to further streamline the secure and efficient movement of legitimate, low risk traffic across our shared border."

Our countries have made major advances since 9/11 in developing improved security policies, systems and processes. With our common approach to security in an evolving and strengthened North American relationship. Over the past three months, experts from the United States, Mexico and Canada have developed specific plans and objectives to meet these goals. These North American plans and objectives, once fully implemented by the bilateral and trilateral working groups now engaged, will bring transformational improvements to our common security goals, specifically:

### I. Securing North America from External Threats

We have established plans to develop and implement comparable processes which produce consistent outcomes for screening individuals prior to departure and at first point of entry into North America, as well as to develop and implement compatible screening methods for goods and cargo prior to departure from a foreign port and at the first point of entry to North America. These strategies include commitments on:

• **Biometrics and secure documentation vision.** We will work to develop systems that prevent high-risk travelers from coming to North America, and facilitate legitimate travel to and within North America, by enhancing our ability to verify traveler identities.

• We will test technology and make recommendations, over the next 12 months, to enhance the use of biometrics in screening travelers destined to North America with a view to developing compatible biometric border and immigration systems.

• We will develop standards for lower-cost secure proof of status and nationality documents to facilitate cross-border travel, and work to achieve optimal production before January 1, 2008.

• We will devise a single, integrated global enrollment program for North American trusted traveler programs within the next 36 months.

• **Real-time information sharing.** We will ensure real-time information sharing on high-risk individuals and cargo, and thereby better enable our Governments to prevent them from entering North America, including by:

• Negotiating terrorist screening information agreements and examining other appropriate linkages between Canada, Mexico and the United States.

• Completing the negotiation of the Canada-U.S. visa information sharing agreement within 18 months.

• Finalizing protocols to share information on high-risk cargo.

• **Compatible screening standards** . We will implement compatible border security measures so that we can better screen out high risk individuals and cargo before they depart for North America, including by :

• Developing a reciprocal mechanism within 12 months to inform visa-free travel program country reviews.

• Developing benchmarks on procedures and policies for visitor visa processing , including security screening, visa validity, length of stay, quality control measures and access to appeal or review, within 9 months.

• Developing compatible criteria for the posting of lookouts of suspected terrorists and criminals within 9 months.

• **Export controls for radioactive sources.** Within 18 months, we will implement import /export control programs, consistent with newly established international standards, to minimize the risk of illicit movements of radioactive materials that could be used for malicious purposes such as "dirty bombs".

• **Bioprotection** . Within 24 months, we will develop a coordinated strategy to identify and manage threats to our food supply and agricultural sectors, consistent with each country's legislation, and share approaches of determining risk from imported foods.

## II. Preventing and Responding to Threats within North America

In North America, we have established plans for equivalent approaches to strengthen aviation security, to enhance maritime transportation and port security, to combat transnational threats to the United States , Canada, and Mexico, including terrorism, organized crime, illegal drugs, migrant and contraband smuggling and trafficking, to enhance partnerships on intelligence and information sharing, and to develop and implement a common approach to critical infrastructure protection, and response to cross-border terrorist incidents and, as applicable, natural disasters. These strategies include commitments on:

• Preparedness. We will implement a comprehensive North American program to ensure that our Governments are prepared to respond to large-scale incidents, including by:

• Developing protocols within 12 months to manage incidents that impact border operations.

• Strengthening capabilities to respond to maritime incidents and minimize the impact on maritime commerce.

• Developing a comprehensive law enforcement strategy to respond to transnational terrorist incidents in North America.

• Ensuring interoperability of communications systems used in response operations.

• Drafting and signing protocols for mutual assistance and support in response to a cross-border public health emergency.

• Conducting a preparedness exercise in advance of the 2010 Winter Olympics in Vancouver/Whistler.

• Critical Infrastructure Protection. We will complete coordinated vulnerability assessments to identify our critical cross-border infrastructure and seek to enhance its protection.

• Mari t ime and Aviation Security. We will develop and implement a comprehensive North American approach to strengthening maritime and aviation security, including by:

• Developing comparable standards and procedures for the screening of aviation passengers, hold baggage and cargo and by working together on passenger assessment programs that reflect each nation's legislation.

- Developing and implementing plans to make port and vessel security regimes more compatible to secure our contiguous waters, and to enhance coordination of regional operations to secure our maritime borders.

- U.S.- Mexico Border Enforcement against Smuggling Organizations. We will form intelligence sharing task force pilots to target cross border criminal activity, in particular criminal gang and trafficking organization networks, and thereby reduce violence along the border.

- U.S.-Canada Great Lakes/St. Lawrence Seaway Enforcement Program. We will develop coordinated maritime law enforcement programs on the St. Lawrence Seaway/Great Lakes systems with a specific interest in interdicting smugglers/traffickers and ensuring border security.

### III. Further Streamlining the Secure Movement of Low-Risk Traffic across our Shared Borders

We have also developed a border facilitation plan to build capacity and improve the flow of legitimate trade and travel at ports of entry within North America. This strategy includes commitments on:

- Working with local stakeholders along the border to make our existing infrastructure more efficient, for example by considering the expansion of the Detroit/Windsor 25% challenge to other land border crossings where applicable.

- Evaluating and making recommendations for expanding the Vancouver NEXUS -Air pilot to other U.S. air preclearance sites in Canada and examining feasibility of expanding the eligibility for NEXUS-Air to include Mexican nationals, within six months.

- Completing negotiations of a formal Canada-U.S. land preclearance agreement within 6 months, contingent on legislative amendments.

- Considering programs to substantially reduce transit times and border congestion like partnering with state, provincial and local governments and the private sector to establish "low-risk" port of entry pilots for the exclusive use of those enrolled in our trusted trade and traveler programs.

- Assessing feasibility of further streamlining FAST processing at ports of entry.

- Expanding the SENTRI program to priority ports of entry within 12 months.

# ATTACHMENT 3

*Security and Prosperity Partnership of North America*

*Alianza para la Seguridad y la Prosperidad de América del Norte*

*Partenariat Nord-américain pour la Sécurité et la Prospérité*

2005



Report to Leaders       / Annex
Reporte a los Mandatarios / Anexo
Rapport aux Chefs        Annexe

# Table of Contents



## Prosperity

Manufactured Goods and Sectoral and Regional Competitiveness.................3
Movement of Goods...................12
E-Commerce and ICT...................14
Financial Services...................17
Transportation...................21
Energy...................28
Environment...................34
Food and Agriculture...................38
Health...................47

## Security

*SECURE NORTH AMERICA FROM EXTERNAL THREATS*
Traveller Security...................60
Cargo Security...................63
Bioprotection...................67
*PREVENT AND RESPOND TO THREATS WITHIN NORTH AMERICA*
Aviation Security...................72
Maritime Security...................74
Law Enforcement Cooperation...................77
Intelligence Cooperation...................80
Protection, Prevention and Response...................82
*FURTHER STREAMLINE THE SECURITY MOVEMENT OF LOW-RISK
TRAFFIC ACROSS OUR SHARED BORDERS*
Border Facilitation...................86
Science and Technology Cooperation...................89

# Manufactured Goods and Sectoral and Regional Competitiveness: Other Initiatives

| INITIATIVE | HOW IT BENEFITS NORTH AMERICA | KEY MILESTONES |
|---|---|---|
| Enhance regulatory cooperation in marine safety equipment and pleasure craft. | This will promote market access and reduce costs. | Determine the need and desirability for negotiating an equivalency agreement, and identify the product categories and standards/regulations for coverage for marine equipment.<br><br>Determine the need for negotiating a mutual recognition agreement to recognize certificates of conformity for the construction of pleasure craft. |
| Strengthen and enhance the exchange of information and public health and safety cooperative activities related to the safety of consumer products. | The Memoranda of Understanding will establish mechanisms where sharing and exchange of information related to risk management, enforcement/compliance, laboratory testing, recall, regulatory development, and post-marketing surveillance will improve consumer product safety in North America. | Finalize and sign a Memorandum of Understanding between the U.S. and Canada: June 2005.<br><br>Finalize and sign a Memorandum of Understanding between the U.S. and Mexico.<br><br>Initiate negotiations on a potential Memorandum of Understanding between Canada and Mexico. |
| Work to more effectively identify and respond to factors affecting the competitiveness of the North American economy. | The fast-changing dynamics of globalization offer significant opportunities but also pose common challenges for North American firms. North American governments are also affected and must be flexible and rapid in their responses. Building on the work of existing organizations that provide strategic advice on ways to strengthen the North American economy will help the governments identify these issues. | Develop a proposal for consideration by Ministers that would build upon the work of existing organizations: by March 2006. |

# ATTACHMENT 4

### North American Competitiveness Council
### (NACC)

We agree that increasing private sector engagement in the SPP by adding high-level, visible business input will assist governments in enhancing North America's competitive position.

We therefore propose the creation of a North American Competitiveness Council (NACC) to provide recommendations on issues concerning North American competitiveness that could be addressed through the SPP. In particular:

- The Council should be free to consider issues that could be addressed trilaterally or bilaterally, since improvements to our respective bilateral relationships also improve North American competitiveness.
- The Council both should address issues of immediate importance and provide high-level, strategic, medium- to long-term advice.
- It also should provide input on the continued compatibility of our shared security and prosperity agendas, given the inherent linkages between security and prosperity in a global marketplace.
- While the Council could be expected to develop recommendations focused primarily on issues to be addressed by governments, the Council should be challenged to provide suggestions on how the private sector might itself be able to assist in promoting North American competitiveness and be part of the solution.

The Council could be comprised of 30 members with equal representation from each country. Each country could determine its own members. Membership selection processes would be at each country's own discretion.

The Council would meet annually with Ministers responsible for both Security and Prosperity, and two to three times per year with senior government officials, and engage on an on-going basis to deliver concrete results. The Council would make recommendations to Leaders annually.

The Council would build on existing mechanisms, such as P4P and CMP and would not displace private sector consultations already on-going at the SPP working group level, or in any other fora, or other specific initiatives on the SPP workplans (such as the APCNA, or the government-industry steel working group).

### Unveiling the Council

The commitment to create a Council could be announced at the March 2006 Leaders meeting, with membership to be determined by end-April 2006, and a first meeting taking place by June 2006.

# ATTACHMENT 5



THE WHITE HOUSE

PRESIDENT GEORGE W. BUSH

PRESIDENT | VICE PRESIDENT | FIRST LADY | MRS. CHENEY | NEWS

Your Government | History & Tours | Kids | E-mail | En Español

Search

Podcasts    RSS Feeds

Home > News & Policies > March 2006

Printer-Friendly Version    Email This Page

For Immediate Release
Office of the Press Secretary
March 31, 2006

White House News

## The Security and Prosperity Partnership of North America: Progress

Canada, Mexico and the United States share a continued commitment to enhance the security, prosperity and quality of life of our citizens within North America. We recognize that the success of our countries is enhanced by working cooperatively. The Security and Prosperity Partnership of North America, which celebrates its first anniversary this month, provides a framework for us to advance collaboration in areas as diverse as security, transportation, the environment and public health.

This Partnership has increased our institutional contacts to respond to our vision of a stronger, more secure, and more prosperous region. In June 2005, our three governments released detailed work-plans identifying key initiatives that form an ambitious agenda of collaboration. Since June, we have worked to implement these initiatives. Many will take months or years to be completed, but we already note significant results. We ask our Ministers to build on this momentum.

We have discussed how we can ensure North America is the most economically dynamic region in the world and a secure home for our citizens. Today, we exchanged views with private sector leaders on how to enhance the competitiveness of North America.

Building on existing commitments, we agree that priority initiatives warrant special attention in the coming year:

**Strengthening Competitiveness in North America.** We are pleased to announce the creation of a North American Competitiveness Council (NACC). The Council will comprise members of the private sector from each country and will provide us recommendations on North American competitiveness, including, among others, areas such as automotive and transportation, steel, manufacturing, and services. The Council will meet annually with security and prosperity Ministers and will engage with senior government officials on an

IN FOCUS

Budget Management
Defense
Economy
Education
Energy
Environment
Gulf Coast
Health Care
Homeland Security
Immigration
Iraq
Judicial Nominations
Medicare
National Security
Pandemic Flu
Patriot Act
Veterans

more issues ⊕

News

Current News
Press Briefings
Proclamations
Executive Orders
Radio

more news ⊕

News by Date

August 2007

The Security and Prosperity Partnership of North America: Progress

July 2007
June 2007
May 2007
April 2007
March 2007
February 2007
January 2007
December 2006
November 2006
October 2006
September 2006
August 2006
July 2006
June 2006
May 2006
April 2006
March 2006
February 2006
January 2006
2005
2004
2003
2002
2001

Appointments

Nominations
Applications

Federal Facts

Federal Statistics

West Wing

History

ongoing basis.

We are convinced that regulatory cooperation advances the productivity and competitiveness of our nations and helps to protect our health, safety and environment. For instance, cooperation on food safety will help protect the public while at the same time facilitate the flow of goods. We affirm our commitment to strengthen regulatory cooperation in this and other key sectors and to have our central regulatory agencies complete a trilateral regulatory cooperation framework by 2007.

**North American Emergency Management.** A disaster - whether natural or man-made - in one of our countries can have consequences across national borders. Our vision for a North American response, relief and recovery strategy would ensure that critical equipment, supplies and personnel can be deployed expeditiously throughout North America. We commit to develop a common approach to critical infrastructure protection, coordinated responses to cross border incidents, and coordinated training and exercises, with the participation of all levels of government in our countries.

**Avian and Human Pandemic Influenza.** Given the highly integrated nature of our economies, an outbreak of pathogenic avian flu or human pandemic influenza in any one of our countries would affect us all. Today, we have agreed to develop a comprehensive, science-based and coordinated approach within North America to avian influenza and human pandemic influenza management. We have endorsed a set of shared principles to underpin cooperative activities by our Governments in all stages of avian influenza and human pandemic influenza management: prevention; preparedness; response; and recovery. Pursuant to these principles, officials will develop, as an immediate priority, incident management protocols to ensure that we are well prepared in advance of an outbreak in North America. For instance, we have agreed to work together to accelerate research, development, production, and availability of human pandemic influenza vaccines, and develop a strategy to best facilitate the sharing of information to enhance the availability of vaccines to the region. We will also establish a small Coordinating Body of senior officials to ensure follow-up on these commitments.

**North American Energy Security.** A sustainable, secure and affordable supply of energy is key to fueling the North American economy. Collaboration in the areas of innovation, energy efficiency, and technology development, including moving these technologies to market, promotes energy security. Our governments renew their commitment to trilateral cooperation on clean energy technologies, conservation, and market facilitation as a means to meeting our shared goals of energy security and sustainable development. Officials will also examine how this cooperation can be expanded to further our climate efforts.

**North American Smart, Secure Borders.** Our vision is to have a border strategy that results in the fast, efficient and secure movement of low-risk trade and travelers to and within North America, while protecting us from threats including terrorism. In implementing this strategy, we will encourage innovative risk-based approaches to improving security and facilitating trade and travel. These include close coordination on infrastructure investments and vulnerability assessments, screening and processing of travelers, baggage and cargo, a single integrated North American trusted traveler program, and swift law enforcement responses to threats posed by criminals or terrorists, including advancing a trilateral network for the protection of judges and officers.

The Security and Prosperity Partnership of North America: Progress

The Security and Prosperity Partnership of North America represents a broad and ambitious agenda. We instruct our Ministers to develop options to strengthen the SPP and present them next June as part of the second report on progress of the SPP.

President Fox and President Bush were pleased to accept, on behalf of their countries, Prime Minister Harper's invitation to host the next trilateral leaders meeting in Canada in 2007.

# # #

Printer-Friendly Version    Email This Page

President | Vice President | First Lady | Mrs. Cheney | News & Policies

History & Tours | Kids | Your Government | Appointments | Jobs | Contact | Text only

Accessibility | Search | Privacy Policy | Help | Site Map

**ATTACHMENT 6**



# THE WHITE HOUSE
### PRESIDENT GEORGE W. BUSH

PRESIDENT | VICE PRESIDENT | FIRST LADY | MRS. CHENEY | NEWS

Your Government | History & Tours | Kids | E-mail | En Español

Search

Podcasts    RSS Feeds

For Immediate Release
Office of the Press Secretary
March 31, 2006

🖨 Printer-Friendly Version    ✉ Email This Page

📻 White House News



**IN FOCUS**

Budget Management
Defense
Economy
Education
Energy
Environment
Gulf Coast
Health Care
Homeland Security
Immigration
Iraq
Judicial Nominations
Medicare
National Security
Pandemic Flu
Patriot Act
Veterans

more issues ⊕

**News**

Current News
Press Briefings
Proclamations
Executive Orders
Radio

more news ⊕

News by Date

August 2007

Home > News & Policies > March 2006

## The Security and Prosperity Partnership of North America: Next Steps

The three leaders of North America agreed to advance the agenda of the Security and Prosperity Partnership of North America (SPP) by focusing on five high priority initiatives:

**The North American Competitiveness Council.** Increasing private sector engagement in the SPP by adding high-level business input will assist governments in enhancing North America's competitive position and engage the private sector as partners in finding solutions. The Council will:

- Consider issues that could be addressed trilaterally or bilaterally, as improvements in our bilateral relationships enhance North American competitiveness.
- Address issues of immediate importance and provide strategic medium and long-term advice.
- Provide input on the compatibility of our security and prosperity agendas, given the linkages between security and prosperity in a global marketplace.
- Offer ideas on the private sector's role in promoting North American competitiveness.

**Advancing Cooperation on Avian and Pandemic Influenza.** Leaders agreed to the following principles to guide collaboration on all stages of avian or pandemic influenza management:

- Share information among our governments in an open, timely and transparent manner.
- Adopt an integrated and comprehensive approach that incorporates animal and public health aspects in managing avian influenza and influenza pandemics.

The Security and Prosperity Partnership of North America: Next Steps

- Ensure coordination within our respective national governments on all aspects of emergency management for an avian influenza outbreak or a human influenza pandemic, by building on existing mechanisms of cooperation and strengthening them as required.
- Coordinate our actions and leverage our respective capacities to ensure rapid and effective steps are taken to deal with avian influenza outbreaks or a human influenza pandemic in North America.
- Advise one another in advance of making any decision that could seriously affect the other countries.
- Base our actions on the best available science and evidence-based decision-making.
- Agree that the imposition and removal of veterinary or public health measures on the movement of people, animals, and goods, under our national laws and international obligations, will not be more restrictive or maintained longer than necessary to achieve the veterinary or public health objective so as to avoid unnecessary interference with the movement of people and goods within North America.
- Ensure that the business continuity plans of our respective governments consider the highly interconnected nature of our economies.
- Strive to utilize clear and consistent messaging to the public and international organizations that is proactive, timely and accurate.

**North American Energy Security Initiative.** A secure and sustainable energy supply is essential for our economic prosperity in North America. To advance our energy agenda we have agreed to:

- Enhance the development of a diverse energy resource base in North America by increasing collaboration on research, development and commercialization of clean energy-related technologies, and
- Strengthen the North American energy market by improving transparency and regulatory compatibility, promoting the development of resources and infrastructure, increasing cooperation on energy efficiency standards, and supporting other efforts aimed at addressing challenges on the demand side.

**North American Emergency Management.** The commitments made in the SPP recognize that a disaster - whether natural or man-made - in one North American country can have consequences across national borders, and may demand a common approach to all aspects of emergency management. Recent experience with hurricanes, ice storms, industrial accidents and the like demonstrate our interdependencies, as well as the need for coordination and mutual assistance in protecting and safekeeping our populations. Moving forward we will:

- Develop a common approach to critical infrastructure protection, and response to cross border terrorist incidents and natural disasters, across a number of different sectors including, but not limited to, transportation, energy, and telecommunications.
- Develop and implement joint plans for cooperation for incident response, as well as conduct coordinated training and exercises in emergency response.

**Smart, Secure Borders.** Leaders agreed to complete the following activities, to contribute to smart and secure borders, over the next twenty-four months:

July 2007
June 2007
May 2007
April 2007
March 2007
February 2007
January 2007
December 2006
November 2006
October 2006
September 2006
August 2006
July 2006
June 2006
May 2006
April 2006
March 2006
February 2006
January 2006
2005
2004
2003
2002
2001

Appointments

Nominations
Applications

Federal Facts

Federal Statistics

West Wing

History

- Collaborate to establish risk-based screening standards for goods and people that rely on technology, information sharing and biometrics.
- Develop and implement compatible electronic processes for supply chain security that use advanced electronic cargo information to analyze risk and ensure quick and efficient processing at the border;
- Develop standards and options for secure documents to facilitate cross-border travel;
- Exchange additional law enforcement liaison officers to assist in criminal and security investigations; and,
- Develop coordinated business resumption plans at border crossings to ensure legitimate trade continues.

## The Security and Prosperity Partnership of North America
### Key Accomplishments since June 2005

The Security and Prosperity Partnership of North America (SPP), launched by the leaders of Mexico, Canada and the United States in March 2005, aims to promote growth and economic opportunity, increase security, and improve the quality of life of our peoples. In June 2005, lead Ministers issued a joint report outlining steps to achieve these goals. Since then, highlights of accomplishments include:

- To enhance growth and competitiveness in a key sector, the North American Steel Trade Committee developed a new strategy aimed at reducing market distortions, facilitating trade and promoting overall competitiveness through innovation and market development.

- To adapt to changes in sourcing and production methods, the three countries have analyzed ways to liberalize requirements for obtaining NAFTA duty-free treatment. Changes to the rules of origin have been implemented successfully and technical teams are working on additional changes.

- To speed up response times when managing infectious disease outbreaks, save lives, and reduce health care costs, the United States and Canada signed an agreement to enable simultaneous exchange of information between virtual national laboratory networks (PulseNet).

- To make consumer goods safer, save lives, and prevent injuries, the United States and Mexico signed an agreement for advance notifications when consumer goods violate one country's safety standards or pose a danger to consumers. Canada and the United States signed a similar agreement in June.

- The United States and Canada signed an agreement, which is a milestone in pipeline regulatory cooperation, to allow increased compliance data sharing, staff exchanges and joint training. The sharing of best practices will lead to a more uniform regulatory approach for cross border pipelines.

- The United States and Canada reached a full Open-Skies aviation agreement, removing all economic restrictions on air service to, from, and beyond one another's territory by the airlines of both countries. The agreement will encourage new markets development, lower prices and greater

competition.

- The United States and Mexico expanded air service in specific markets by increasing the number of designated passenger airlines per city-pair, and opening cooperative marketing arrangements (code-sharing) to airlines of either country and carriers of third countries.

- In order to increase navigational accuracy across the region, five Wide Area Augmentation System (WAAS) stations were installed in Canada and Mexico in 2005.

- To promote prosperity by reducing the costs of trade, the United States and Canada decreased transit times at the Detroit/Windsor gateway, our largest border crossing point, by 50 percent.

- To support increased trade and expedite secure processing of cross-border trade and travel between Mexico and the United States, six FAST/Express lanes are operating at the US-Mexico border, a new lane in Nogales will open soon, and we are working on a project for a lane in Matamoros. Exclusive lines and schedules will be implemented at nine crossings.

- To allow more efficient examination of rail cargo for hazardous materials and illicit flows of goods, the United States and Mexico have installed gamma ray equipment at key border crossings.

- To speed cargo shipping, the three countries are developing uniform in-advance electronic exchange of cargo manifest data for maritime, railroad and motor carriers.

- To improve air quality and promote a more competitive automotive industry, Mexico implemented an official standard to reduce sulfur in fuels. This will increase supply of low-sulfur fuels in Mexico.

- To increase border security, Mexican and U.S. agencies are harmonizing risk assessment mechanisms, exchanging information, and establishing protocols to facilitate detection of fraud and smuggling.

- To strengthen the integrity and security of asylum and refugee status determination systems, the United States and Canada launched a pilot project to share information on refugee and asylum claimants based on a comparison of fingerprint records.

- To address border violence, United States and Mexico signed an Action Plan to Combat Border Violence and Improve Public Safety. Officials of the two countries in Nogales, AZ- Nogales, Sonora and Laredo, TX- Nuevo Laredo completed protocols on border security and public safety.

- Under the United States-Mexico Voluntary Repatriation Program, more than 35,000 persons, including 20,500 in 2005, were returned to their home in a secure, legal, and humanitarian way.

- To increase maritime security, the United States and Canada completed joint exercises on the St. Clair and Detroit Rivers in September and in February during Super Bowl XL. Officers, who were cross-designated on vessels of the other nation, could authorize pursuit of suspect vessels crossing jurisdictions.

- To advance preparedness to address a cyber incident affecting critical infrastructure, authorities from the United States and Canada completed a multi-national exercise, Cyberstorm, in February 2006.

- To enhance aviation security, the United States, Canada, and Mexico completed training on principles to protect aircraft from terrorism threats, on marksmanship skills, and on emergency procedures.

- To enhance port security, Canada and the United States concluded port facility visits at Oakland, CA and Vancouver, BC in October 2005 to facilitate the development of benchmark security standards.

- To ensure food safety while facilitating trade, a Food Safety Coordinating Task Force was formed and is developing a prioritized list of standards to compare for similarities, differences, and scientific bases for the differences. These efforts will facilitate the development of North American standards and, as appropriate, the removal of differences in standards.

- To enhance clarity and compatibility of energy regulation, Canadian, U.S. and Mexican regulators began regular meetings to exchange information on regulatory standards and energy market developments and to discuss bringing gas from Alaska to the North American market.

- To reduce marine air pollution, Canada and the United States have coordinated data collection, marine inventory development and air quality monitoring. The two countries are preparing to approach the International Maritime Organization to designate special areas for controlling sulfur emissions from marine vessels.

- Canada and the United States are developing Mutual Assistance Arrangements, which will enhance our preparedness for cross-border public health emergencies; Mexico has been invited to participate.

# # #

🖶 Printer-Friendly Version   ✉ Email This Page

# ATTACHMENT 7

Press Release



**FOR IMMEDIATE RELEASE**
**Thursday, June 15, 2006**

## UNITED STATES, CANADA AND MEXICO LAUNCH NORTH AMERICAN COMPETITIVENESS COUNCIL

*U.S. Secretary of Commerce Carlos Gutierrez, Mexican Secretary of Economy Sergio Garcia de Alba and Canadian Minister of Industry Maxime Bernier meet with North American Business Leaders*

**Washington, DC -** U.S. Commerce Secretary Carlos Gutierrez, Mexican Economy Minister Sergio Garcia de Alba and Canadian Minister of Industry Maxime Bernier today met with North American business leaders to officially launch the North American Competitiveness Council (NACC). In March, U.S. President Bush, Canadian Prime Minister Harper, and Mexican President Fox, announced the creation of the NACC as a priority to their commitment to the Security and Prosperity Partnership of North America (SPP).

"Today is a continuation of President Bush's strong commitment to our North American partners to focus on North America's security

http://www.commerce.gov/opa/press/Secretary_Gutierrez/2006_Releases/June/15_US_Canada_Mexico_NACC_Launch_rls.htm    8/13/2007

and prosperity," said Commerce Secretary Carlos Gutierrez. "The private sector is the driving force behind innovation and growth, and the private sector's involvement in the SPP is key to enhancing North America 's competitive position in global markets."

The NACC is made up of high level business leaders from each country. Each country's council consists of ten members who will meet annually with the SPP Prosperity and Security Ministers to provide recommendations and priorities on promoting North American competitiveness globally. In addition, the governments of North America will work with the NACC to remove barriers in order to increase the competitiveness of North American firms in the global marketplace and spur economic growth.

Also today, the SPP Prosperity Ministers, Secretary Gutierrez, Secretary Garcia de Alba and Minister Bernier, met to take stock of progress on the Prosperity component of the SPP. The SPP Security Ministers, Homeland Security Secretary Michael Chertoff, Canadian Minister of Public Safety Stockwell Day and Mexican Secretary of Interior Carlos Abascal, are also taking stock of progress on the Security component with a view to releasing a report in July. The Security and Prosperity Ministers will hold a meeting with the NACC in early fall 2006 to discuss their priorities. They will also discuss updates to the work plans and consider new initiatives.

On March 23, 2005, leaders of North America launched the SPP. This initiative is meant to reduce trade barriers and facilitate economic growth, while improving the security and competitiveness of the continent. The leaders of North America affirmed their commitment to the SPP when they met on March 31, 2006 in Cancun, Mexico.

The SPP is built on the North American Free Trade Agreement between the United States, Canada and Mexico (NAFTA) which entered into force on January 1, 1994. NAFTA created the world's largest free trade area, which now links 435 million people producing $13.8 trillion worth of goods and services. Total trade among all three NAFTA partners has grown from $296.7 billion in 1993 to $807.4 billion in 2005, an increase of 172 percent. The dismantling of trade barriers and the opening of markets has led to economic growth and rising prosperity in all three countries.

Press Release

SPP Recent Accomplishments (Fact Sheet)

US Department of Commerce, 1401 Constitution Avenue, NW, Washington, DC 20230
Last Updated: May 14, 2007 12:02 PM

Contact Secretary Gutierrez by e-mail at cgutierrez@doc.gov.
Direct inquiries about this page to webmaster@doc.gov.

# ATTACHMENT 8

http://www.uschamber.com/NR/rdonlyres/

e 3 3plv twj f wqr 5vn wd fiz fvnp 7 p kre5 fmy bfth yi 5

frvreg 7z7 corcvatoerq movtr povh iwhrlccdgdrj 27p 7i+znb /

## NACC SECRETARIATS

6S NACC
Secretariats.pdf

The governments of Canada, Mexico and the United States designated organizations in each of their countries to serve as Secretariats for the North American Competitiveness Council (NACC) and to help collect input from the private sector.

- The **Canadian Council of Chief Executives (CCCE)** is Canada's premier business association, with an outstanding record of achievement in matching entrepreneurial initiative with sound public policy choices. Our member CEOs and entrepreneurs represent all sectors of the Canadian economy. The companies they lead collectively administer CAD$3.2 trillion in assets, have annual revenues in excess of CAD$750 billion, and are responsible for the vast majority of Canada's exports, investment, research and development, and training.

- The **Instituto Mexicano para la Competitividad (IMCO)** is a private applied research center devoted to studying issues that affect Mexico's competitiveness in a context of an open market economy. IMCO is a not-for-profit, independent, non-partisan institution which operates thanks to private sponsors grants. Founded in 2003, the Institute seeks to compete successfully in the "market of ideas" by preparing and issuing sound proposals for public policies based on objective approaches to systematically improve Mexico's ability to attract and retain investments.

- The **Council of the Americas** and the **U.S. Chamber of Commerce** jointly serve as the Secretariat of the U.S. Section of the NACC.

  The **Council of the Americas** is a business organization whose members share a commitment to democracy, open markets, and the rule of law throughout the Americas. The Council of the Americas' programming and advocacy aim to inform, encourage, and promote free and integrated markets for the benefit of the companies that comprise our membership, as well as of the United States and all the people of the Americas. The Council supports these policies in the belief that they provide an effective means of achieving the economic growth and prosperity on which the business interests of its members depend.

  The **U.S. Chamber of Commerce** is the world's largest business federation representing more than 3 million businesses of all sizes, sectors, and regions. It includes hundreds of associations, thousands of local chambers, and more than 100 American Chambers of Commerce in 91 countries.

Civil Action No. 07-cv-1446 (PLF)

EXHIBIT 2

☑ 002/002



**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer**
**Assistant Secretary for Administration**
Washington, D.C. 20230

July 31, 2007

Mr. Christopher J. Farrell
Director of Research and
  Investigations
Judicial Watch
501 School Street, S.W.  Suite 500
Washington, D.C.  20024

Dear Mr. Farrell:

We acknowledge receipt of your Freedom of Information Act (FOIA) request at the
Department of Commerce.   The FOIA case number assigned to your request is CRRIF
07-350.  If you have questions regarding your request please contact Linda Bell,
International Trade Administration Office of Organizational and Management Support,
Washington, D.C. 20230, Phone: (202) 482-3032, Fax: (202) 482-1584,
Linda_Bell@mail.doc.gov .

Sincerely,

Harriette Boyd

Harriette Boyd
Freedom of Information Act Specialist

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Civil Action No. 07-cv-1446 (PLF) |
| U.S. DEPARTMENT OF COMMERCE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of Plaintiff's Application for a Temporary Restraining Order and/or Preliminary Injunction and Request for Expedited Hearing and Defendants' opposition thereto, it is hereby

ORDERED that Plaintiff's motion for a temporary restraining order is DENIED and Plaintiff's motion for a preliminary injunction is DENIED.

Dated:

_____
PAUL L. FRIEDMAN
UNITED STATES DISTRICT JUDGE