## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Civil Action No. 07-cv-1446 (RMU) |
| U.S. DEPARTMENT OF COMMERCE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR FOR FAILURE TO STATE A CLAIM

Defendants U.S. Department of Commerce and Carlos Gutierrez, Secretary of Commerce, hereby move the Court to dismiss this action for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure or for failure to state a claim under Rule 12(b)(6), for the reasons stated in the attached memorandum of points and authorities. A proposed order is attached.

Dated: October 9, 2007          Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Branch Director

/s/ JAMES C. LUH
JAMES C. LUH
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave NW
Washington DC 20530
Tel: (202) 514-4938
Fax: (202) 616-8460
E-mail: James.Luh@usdoj.gov
Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,           )
                                )
            Plaintiff,          )
        vs.                     )
                                )    Civil Action No. 07-cv-1446 (RMU)
U.S. DEPARTMENT OF COMMERCE, et )
    al.,                        )
                                )
            Defendants.         )
                                )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FOR LACK OF JURISDICTION OR FOR FAILURE TO STATE A CLAIM

## INTRODUCTION

Judicial Watch, Inc., alleges that the Department of Commerce and the Secretary of Commerce (collectively the "Commerce Department") have been violating the Federal Advisory Committee Act (FACA), 5 U.S.C. app. §§ 1–16, a federal open-government statute, in their interactions with the North American Competitiveness Council (NACC), a private-sector group that makes recommendations on regional policy priorities on behalf of businesses in the United States, Mexico, and Canada.

Judicial Watch's complaint should be dismissed for lack of subject matter jurisdiction, because Judicial Watch's allegations do not present a live case or controversy that can be resolved in a federal court. Judicial Watch's complaint does not identify any specific request for information about the NACC that has been denied by the Commerce Department, so Judicial Watch has not demonstrated an injury that could support standing to sue. Similarly, claims related to Judicial Watch's desire to attend meetings of the NACC fail because Judicial Watch has not demonstrated an imminent injury causally linked to the actions of the Commerce

Department or redressable by an order against the Commerce Department. The August 20–21 meeting that Judicial Watch sought to attend has already taken place, and Judicial Watch has not alleged that it has sought to attend any future meetings or that the Commerce Department has any means of ensuring that Judicial Watch could attend any future NACC meetings. Moreover, Judicial Watch's complaint does not state any claim that would fall within the Court's statutory mandamus jurisdiction.

Judicial Watch's complaint further fails to state a claim upon which relief can be granted, because the FACA simply does not apply to the NACC, the U.S. component of the NACC, or the advisory council associated with the U.S. component of the NACC. The complaint does not allege that the Commerce Department was involved in the creation of the NACC or has ever been involved in the management or control of the NACC in a way that would trigger the application of FACA. Accordingly, the Court should dismiss Judicial Watch's complaint.

## BACKGROUND

### I.    Statutory Background of the Federal Advisory Committee Act

The Federal Advisory Committee Act (FACA), 5 U.S.C. app. §§ 1–16, enacted in 1972, was "born of a desire to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.' Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature." Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 445–46 (1989) (quoting 5 U.S.C. app. § 2(a))

(citation omitted).

FACA places limits on the creation and public operation of bodies that fall within the Act's definition of "advisory committee." 5 U.S.C. app. § 3(2). However, to fall within the definition, a group must be either "established by statute or reorganization plan" or "established or utilized" by the President or one or more agencies, and the group's establishment or utilization must be "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." Id. § 3(2). The Supreme Court and the D.C. Circuit have accorded a restrictive interpretation to these terms, in keeping with Congress's intent to focus the Act on a narrow class of advisory groups. See, e.g., Pub. Citizen, 491 U.S. at 452–53. The D.C. Circuit has determined, for example, that a group is "established" by the government only if its members are appointed by the government directly, without the involvement of any intermediary, and that a group is "utilized" by the government only if the government exercises actual management or control over the group. See, e.g., Byrd v. U.S. EPA, 174 F.3d 239, 245–46 (D.C. Cir. 1999).

The Act regulates such "advisory committees" in a number of ways. For example, it prohibits the establishment of new advisory committees in the absence of specific statutory or presidential authorization or a formal determination by an agency that such establishment would be in the public interest. Id. § 9(a). In addition, the Act, in pertinent part, provides that a committee subject to the Act must file a charter, id. § 9(c); keep detailed minutes of its meetings, id. § 10(c); provide advance notice of its meetings and open them to the public, unless the President or agency head determines that a meeting may be closed in accordance with the Government in the Sunshine Act, id. § 10(a), (d); and make its records, reports, transcripts, minutes, working papers, studies, agenda, and other documents publicly available subject to the

terms and exemptions of the Freedom of Information Act, <u>id.</u> § 10(b).

## II.     The North American Competitiveness Council[1]

On March 23, 2005, the President of the United States, the Prime Minister of Canada, and the President of Mexico met in Waco, Texas, and launched the Security and Prosperity Partnership of North America (SPP), a joint initiative aimed at enhancing the security and prosperity of the three countries through greater cooperation.  <u>See</u> Compl. for Declaratory and Injunctive Relief & Pet. for Writ of Mandamus ¶ 9.  The SPP seeks to address subjects of mutual interest to the United States, Mexico, and Canada in areas such as the movement of goods, traveler security, energy, environment, and health.  <u>See</u> Compl. ¶ 9.

In a June 23, 2005, Report to Leaders, U.S., Mexican, and Canadian cabinet secretaries and ministers described an initiative to "[w]ork to more effectively identify and respond to factors affecting the competitiveness of the North American economy."  Security and Prosperity Partnership of North America, Report to Leaders annex at 10 (2005), <u>available at</u> http://www.spp.gov/report_to_leaders/prosperity_annex.pdf?dName=report_to_leaders.  In 2005 and 2006, the three governments discussed the possibility of encouraging greater input from the private sector on ways to enhance North American competitiveness.  <u>See</u> Mem. of P. & A. in Opp'n to Pl.'s Application for a TRO And/Or Prelim. Inj. Ex. 1 ¶¶ 4–6 [<u>hereinafter</u> Bastian Decl.] (declaration of Walter M. Bastian).  By early 2006, these discussions produced a concept

---

[1]Where appropriate, this section contains citations to the plaintiff's complaint.  However, for purposes of providing a background description of the North American Competitiveness Council, this section also recites some facts that are not alleged in the plaintiff's complaint and that may be disputed.  <u>See</u> D.D.C. Civ. R. 7(a) (stating that a memorandum of points and authorities in support of a motion should include "a concise statement of facts").  The defendants do not rely on these facts for their motion to dismiss.  The defendants' arguments in favor of dismissal for lack of jurisdiction rely only on the facts specifically cited in section I of the Argument section below.  The defendants' arguments in favor of dismissal for failure to state a claim rely only on the facts specifically cited in section II of the Argument section below.

paper envisioning a trilateral group led by the private sector.  <u>See</u> Bastian Decl. Attach. 4.

On March 15, 2006, U.S., Mexican, and Canadian business leaders met with Secretary of Commerce Carlos M. Gutierrez and representatives from the governments of Mexico and Canada to discuss North American competitiveness and the development of a trilateral private-sector group.  <u>See</u> Compl. ¶ 10.  The meeting was hosted by two nongovernmental groups, the Council of the Americas and the U.S. Chamber of Commerce.[2]  Bastian Decl. ¶ 7.  The Secretary of Commerce delivered opening remarks at the meeting.  Bastian Decl. ¶ 7.  Attendees expressed support for a private-sector group, and the Council of the Americas and the U.S. Chamber of Commerce offered to act as the U.S. Secretariat of the proposed private-sector group.  Bastian Decl. ¶ 7.

On March 31, 2006, the President of the United States, the Prime Minister of Canada, and the President of Mexico announced the formation of the North American Competitiveness Council, a trilateral private-sector council that, as described in a statement issued by the three countries' leaders, "will comprise members of the private sector from each country and will provide us recommendations on North American competitiveness, including, among others, areas such as automotive and transportation, steel, manufacturing, and services."  Press Release, White House, The Security and Prosperity Partnership of North America: Progress (Mar. 31, 2006), <u>available at</u> http://www.whitehouse.gov/news/releases/2006/03/20060331.html.  A White House press release issued the same day described the NACC as follows:

---

[2]The Council of the Americas describes itself as a business organization that seeks to promote free trade and open markets in the Americas.  <u>See</u> Council of the Americas, About, http://coa.counciloftheamericas.org/page.php?k=about (last visited Oct. 4, 2007).  The U.S. Chamber of Commerce describes itself as a private business organization that seeks to promote business and free enterprise.  <u>See</u> U.S. Chamber of Commerce, About the U.S. Chamber of Commerce, http://www.uschamber.com/about/ (last visited Oct. 4, 2007).

The North American Competitiveness Council.  Increasing private sector engagement in the SPP by adding high-level business input will assist governments in enhancing North America's competitive position and engage the private sector as partners in finding solutions.  The Council will:

- Consider issues that could be addressed trilaterally or bilaterally, as improvements in our bilateral relationships enhance North American competitiveness.

- Address issues of immediate importance and provide strategic medium and long-term advice.

- Provide input on the compatibility of our security and prosperity agendas, given the linkages between security and prosperity in a global marketplace.

- Offer ideas on the private sector's role in promoting North American competitiveness.

Press Release, White House, The Security and Prosperity Partnership of North America: Next Steps (Mar. 31, 2006), available at http://www.whitehouse.gov/news/releases/2006/03/20060331-1.html.

On June 15, 2006, the Secretary of Commerce and his counterparts in the Mexican and Canadian governments met with private-sector representatives at a launch ceremony for the NACC.  See Compl. ¶ 14.

The NACC consists of thirty private-sector business leaders, ten from each country. Bastian Decl. ¶ 11.  Each country's component is supported by its own Secretariat; the Council of the Americas and the U.S. Chamber of Commerce jointly serve as the Secretariat of the U.S. component.  See Compl. ¶ 20.  The ten members of the U.S. component that attend each full NACC meeting come from a pool of fifteen companies selected by the Council of the Americas and the U.S. Chamber of Commerce without the involvement of any U.S. government official.[3]

_____

[3]Judicial Watch's complaint refers to this group of fifteen members—the U.S. component of the NACC—as the "Executive Committee." Compl. ¶ 22.

Bastian Decl. ¶¶ 12–14.  The complaint does not allege that the U.S. government has ever funded

or appointed the members of either the NACC or its U.S. component, has ever scheduled

meetings or set meeting agendas for either body, or participated in developing the final product

for the NACC.  With respect to the U.S. component of the NACC, these functions have been

handled by the Council of the Americas and the U.S. Chamber of Commerce.  <u>See</u> Bastian Decl.

¶ 16.

The Council of the Americas and the U.S. Chamber of Commerce have established an

advisory council to the U.S. component.[4]  According to the NACC, the advisory council has

approximately 200 members.  <u>See</u> North American Competitiveness Council, NACC Members

(2007), <u>available at</u> http://www.uschamber.com/issues/index/international/nacc.htm (follow

"Members" hyperlink).  The Council of the Americas and the U.S. Chamber of Commerce set

the parameters for participating in this group; no U.S. government official had any role in

establishing the advisory council or has ever attempted to manage the group.  Bastian Decl. ¶ 15.

Since its formation, the NACC has met with the Secretary of Commerce and his

counterparts in the governments of Canada and Mexico four times.  The first meeting was the

June 15, 2006, launch of the NACC.  Bastian Decl. ¶ 17.a.  The second occasion was a

Ministerial Meeting on February 23, 2007, at which the NACC delivered its first report to a

group of U.S., Canadian, and Mexican cabinet secretaries and ministers, including Secretary of

Commerce Gutierrez, Secretary of State Condoleezza Rice, and Secretary of Homeland Security

Michael Chertoff and their counterparts in the Canadian and Mexican governments.  Bastian

Decl. ¶ 17.a.  The third meeting was in June 2007, when the NACC Secretariats, without the

---

[4]Judicial Watch's complaint refers to this group of 200 companies as the "Advisory Committee." Compl. ¶ 23.

members of the NACC, met with the Secretary of Commerce and his Canadian and Mexican counterparts in Atlanta, coinciding with the Americas Competitiveness Forum.  Bastian Decl. ¶ 17.a.

Most recently, the Secretary of Commerce and the Secretary of Homeland Security and their Mexican and Canadian counterparts participated in a Leaders' meeting with the NACC on August 21, 2007, in Montebello, Canada, where the NACC delivered its report to the leaders. The Secretary of Commerce also met with U.S. members of the NACC in Ottawa on August 20, 2007.

## III.   Judicial Watch's Research into the NACC

Judicial Watch describes itself as a nonprofit public interest organization that "seeks to promote integrity, transparency, and accountability in government and fidelity to the rule of law."  Compl. ¶ 3.  According to Judicial Watch's complaint, Judicial Watch has been investigating and monitoring the NACC since approximately July 2006.  Compl. ¶ 28. According to the complaint, Judicial Watch's investigative efforts have included FOIA requests to various federal agencies and correspondence with the U.S. Chamber of Commerce, which serves jointly with the Council of the Americas as the Secretariat for the U.S. component of the NACC.  See Compl. ¶¶ 28–30.

Judicial Watch's complaint states that on July 26, 2007, it sent a letter to the Secretary of Commerce requesting that the Secretary "acknowledge that the NACC and its U.S. component subcommittees are advisory committees under FACA" and "bring the NACC and its U.S. component subcommittees into compliance with all appropriate laws and regulations," which according to Judicial Watch includes FACA's open-meeting and disclosure requirements. Compl. ¶ 31.

**IV.    Judicial Watch's Complaint**

Judicial Watch filed its complaint in this action on August 10, 2007, against the

Department of Commerce and the Secretary of Commerce in his official capacity.  The suit

seeks: (1) a declaratory judgment stating that the NACC, the 15 member companies that serve as

the U.S. component of the NACC (which the complaint collectively refers to as the "Executive

Committee," Compl. ¶ 22), and the advisory council established by the U.S. NACC Secretariat

(which the complaint refers to as the "Advisory Committee," Compl. ¶ 23) are subject to FACA

and that the defendants have violated FACA; (2) an injunction barring the defendants from

continuing the alleged noncompliance with FACA; (3) mandamus relief ordering defendants to

perform "all nondiscretionary duties required by FACA with respect to the operation of the three

groups"; and (4) a permanent injunction requiring defendants to provide all records and other

materials made available to or prepared by or for one of the three groups, including all records

that would be exempt from disclosure under certain provisions of the Freedom of Information

Act.  Compl. at 12–14.

Along with its complaint, Judicial Watch filed a motion for a temporary restraining order

or preliminary injunction compelling the Commerce Department to admit Judicial Watch to a

meeting held August 20 and 21 in Montebello, Canada.  This Court denied the motion for a

temporary restraining order, finding that Judicial Watch had failed to establish either a likelihood

of success on the merits or irreparable injury.  Order (Aug. 16, 2007) (dkt. no. 8); Mem. Op.

(Aug. 21, 2007) (dkt. no. 10).  Judicial Watch withdrew its motion for a preliminary injunction.

Pl.'s Notice of Withdrawal of Application for Prelim. Inj. (dkt. no. 11).

## ARGUMENT

I.    **The Court Lacks Subject Matter Jurisdiction over this Action, Because Judicial Watch Lacks Standing and Judicial Watch's Suit Falls Outside the Court's Statutory Mandamus Jurisdiction.**

A.    **Judicial Watch Lacks Standing to Challenge Any Failure to Release Documents, Because Judicial Watch Has Not Been Denied Access to Specific Documents.**

Judicial Watch lacks standing to challenge the Commerce Department's interactions with the NACC under FACA, because even aside from the fact that FACA does not apply, Judicial Watch has not shown that it has experienced any concrete harm traceable to the Commerce Department's treatment of the NACC, its U.S. component, and the associated advisory council.

Standing is a indispensable requirement for the Court's subject matter jurisdiction under Article III of the Constitution.  See Allen v. Wright, 468 U.S. 737, 750 (1984).  A plaintiff must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  In evaluating standing at the motion to dismiss stage, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

The "irreducible constitutional minimum" of standing requires three elements:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

<u>Defenders of Wildlife</u>, 504 U.S. at 560–61 (citations omitted) (footnote omitted) (alterations in original).  Judicial Watch's complaint fails to establish any of the three requirements of standing.

First, Judicial Watch has not established an injury in fact.  Injury in fact in a FACA case consists of the denial of access to specific agency records.  The plaintiff must demonstrate that it "sought <u>and [was] denied</u> specific agency records."  <u>Pub. Citizen</u>, 491 U.S. at 449 (emphasis added).  In other words, to establish an injury based on failure to disclose materials under FACA, the plaintiff must identify specific materials that it requested but was unable to obtain.  See <u>FEC v. Akins</u>, 524 U.S. 11, 21 (1998) ("[A] plaintiff suffers an 'injury in fact' when the plaintiff <u>fails to obtain</u> information which must be publicly disclosed pursuant to a statute." (emphasis added)); <u>Zivotofsky ex rel. Zivotofsky. v. Sec'y of State</u>, 444 F.3d 614, 617–18 (D.C. Cir. 2006) (explaining that a FACA plaintiff "is injured-in-fact for standing purposes because he did not get what the statute entitled him to receive" in response to a "request for specific information").

In <u>NRDC v. Johnson</u>, 488 F.3d 1002 (D.C. Cir. 2007) (per curiam), the D.C. Circuit explained that the FACA imposes a duty to disclose documents of its own force, so a plaintiff seeking to sue under FACA can establish standing based on a request for documents other than a formal request under the Freedom of Information Act.  <u>Id.</u> at 1003.  However, the court's decision in <u>NRDC</u> did not contradict the settled principle that a plaintiff must request documents, or seek access to the documents in some other manner, before it has standing to challenge an alleged FACA violation.  Indeed, the court's decision in <u>NRDC</u> noted that on remand, it was still open to the district court to decide that the government's release of the requested documents under FOIA deprived the plaintiff of standing—in other words, the district court could still find that the plaintiff lacked standing because the plaintiff failed to show that it had been denied access to the documents. <u>Id.</u>

11

The only request Judicial Watch describes in its complaint is a letter addressed to the Secretary of Commerce and dated July 26, 2007, a mere 15 calendar days before the filing of this suit.[5]  In the letter, Judicial Watch requested that the Secretary "acknowledge that the NACC and its U.S. component subcommittees are advisory committees under FACA and . . . bring their operations into compliance with all appropriate laws and regulations"; "confirm" within eight days that the Montebello meeting "will be open to Judicial Watch and the general public"; and "make all . . . records of the NACC and its U.S. component subcommittees available to Judicial Watch pursuant to the provisions of FOIA."  Pl.'s Application for TRO and/or Prelim. Inj. and Req. for Expedited Hr'g Ex. 12 at 2.

Even if it can be said, based on this letter, that Judicial Watch has lodged a proper request seeking agency documents, Judicial Watch has not identified any specific documents that have ever been within the control of the Department of Commerce and that the Department of Commerce has refused to supply.  In fact, the Department of Commerce is currently handling Judicial Watch's letter as a request for documents under the Freedom of Information Act, 5 U.S.C. § 552, in accordance with Judicial Watch's specific request that the Department of Commerce provide the documents "pursuant to the provisions of FOIA."  Pl.'s Application for TRO and/or Prelim. Inj. and Req. for Expedited Hr'g Ex. 12 at 2.  The Commerce Department

---

[5]Judicial Watch's complaint also mentions a March 23, 2007, letter addressed the U.S. Chamber of Commerce.  Compl. ¶ 29; Pl.'s Application for TRO and/or Prelim. Inj. and Req. for Expedited Hr'g at 7 and Ex. 10.  The U.S. Chamber of Commerce is a private-sector business organization that is not subject to the authority or control of the Department of Commerce. See U.S. Chamber of Commerce, About the U.S. Chamber of Commerce, http://www.uschamber.com/about/ (last visited Oct. 4, 2007).

Judicial Watch also states that it has submitted Freedom of Information Act requests to the Commerce Department in the past, but none of those earlier requests are at issue in this case. See Compl. ¶ 28.

released some responsive documents to Judicial Watch on August 28, 2007, and is continuing to process Judicial Watch's FOIA request.  Because Judicial Watch has not been "denied specific agency records," Pub. Citizen, 491 U.S. at 449, it has no injury that could support Article III standing.

Without showing that it has been denied access to specific documents, Judicial Watch cannot demonstrate an injury in fact.  Judicial Watch cannot rely instead on some supposed harm to its abstract interests in open government or its belief that the Commerce Department's interactions with the NACC create an "appearance" of impropriety, see Compl. ¶ 34. Allegations concerning interests of this sort do not satisfy the requirement that the plaintiff assert an injury that is concrete and particularized.  See Defenders of Wildlife, 504 U.S. at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998) (stating that an abstract interest in seeing "that the Nation's laws are faithfully enforced" is not sufficiently concrete to support standing).

In addition, even if Judicial Watch had standing to seek access to NACC records and proceedings on its own behalf, Judicial Watch still would lack standing to seek an order requiring the Commerce Department to open NACC records and proceedings to the public more generally.  See Compl. at 13.  Because the interest underlying standing in a FACA case is the plaintiff's own personal entitlement to access, see Pub. Citizen, 491 U.S. at 449, the plaintiff's standing is confined to enforcement of that personal interest and does not extend to enforcement of other persons' interests.  See City of Los Angeles v. Lyons, 461 U.S. 95, 101–02 (1983)

13

(stating that Article III standing requires a concrete injury in fact personal to the plaintiff);

DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1867 (2006) (holding that a plaintiff must

establish standing independently for each individual claim and request for relief in its

complaint); NRDC v. Pena, 147 F.3d 1012, 1021 (D.C. Cir. 1998) (holding that even though the

plaintiff had standing to obtain documents under FACA, it lacked standing to seek injunctive

relief that would not redress the injury related to the plaintiff's lack of access to the documents).

Thus, even if Judicial Watch itself had standing to seek access to NACC records and proceedings

under FACA, the most Judicial Watch could secure from a court would be an order requiring the

defendants to provide access to Judicial Watch individually.  Judicial Watch would still lack

standing to seek an order compelling the defendants to open NACC records and proceedings to

the broader public.

Finally, Judicial Watch's request for a declaratory judgment does not satisfy the injury-

in-fact component of standing, nor does it otherwise affect the analysis of whether the complaint

presents an Article III case or controversy.  The federal Declaratory Judgment Act, 28 U.S.C.

§ 2201, only authorizes the issuance of declaratory relief in a case that itself presents an Article

III case or controversy.  See id. (limiting a court's issuance of declaratory relief to "a case of

actual controversy within its jurisdiction"); MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764,

770–71 & n.7 (2007).

     **B.**    **Judicial Watch's Claims Related to Past or Future NACC Meetings Do Not Present a Live Controversy, Because Its Exclusion from the August 20–21 Meeting Was Not Fairly Traceable to the Defendants or Redressable by an Order Against the Defendants, and Claims Related to the Meeting Are Moot Now That the Meeting Has Occurred.**

Judicial Watch also lacks standing to complain of alleged FACA violations in connection

with any past or future NACC meetings.  The only meeting specifically mentioned in Judicial

Watch's July 26, 2007, letter to the Secretary of Commerce is an August 20–21 meeting in

Montebello, Canada:

> . . . Judicial Watch understands that the NACC will be meeting in late August
> 2007 in Montebello, Canada in conjunction with meetings by President Bush,
> Mexican President Felipe Calderon, and Canadian Prime Minister Stephen
> Harper.  Judicial Watch would like to attend and/or participate in any meeting of
> the NACC.  Due to the brief time remaining before the meeting, please have your
> office confirm no later than Friday, August 3, 2007 that any such meeting will be
> open to Judicial Watch and the general public.

Pl.'s Application for TRO and/or Prelim. Inj. and Req. for Expedited Hr'g Ex. 12 at 2.

All that the letter does is state that Judicial Watch desires to attend the meeting and ask

that the Commerce Department "confirm," within eight days of the mailing of the letter, that the

meeting is open to Judicial Watch and the public according to current plans.  Notably, the letter

does not affirmatively request that the Commerce Department take steps to open the meeting if

the meeting is not already open.

Even if the letter can be construed as a proper request to attend the meeting, the letter still

would not have been sufficient to establish standing, because an order binding the Commerce

Department would not have assisted Judicial Watch in obtaining access to the meeting.  The

meeting was held in Canadian sovereign territory in cooperation with the governments of

Canada and Mexico and the private-sector entities that support or take part in the NACC.

Nothing in the complaint suggests that an order against the Commerce Department by itself

would have assisted Judicial Watch in gaining access to the meeting, or that foreign and private-

sector participants would not have taken independent steps to exclude Judicial Watch from the

meeting.  Thus, Judicial Watch has not satisfied the causation or redressability requirements of

standing.  See Defenders of Wildlife, 504 U.S. at 562 (explaining that when the issue of

justiciability "depends on the unfettered choices made by independent actors not before the

courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury"); Greater Tampa Chamber of Commerce v. Goldschmidt, 627 F.2d 258, 263 (D.C. Cir. 1980) (holding that a challenge against an executive agreement was not a justiciable case or controversy in part because redress of the plaintiffs' alleged injuries would depend on the independent response of the United Kingdom); Dynatlantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997) ("[R]edressability and traceability overlap as two sides of a causation coin, and . . . the concepts are closely related.").[6]

Because Judicial Watch could not satisfy the causation and redressability elements of standing, Judicial Watch's desire to attend the August 20 and 21 meeting in Montebello, Canada, did not present a case or controversy even before the meeting.  Furthermore, now that the meeting has come and gone, any case or controversy that may have been presented by the meeting is now moot.  See generally, e.g., City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000).[7]

---

[6]The Court also could not craft an order compelling the Commerce Department to request or persuade Canadian and Mexican authorities to act in a certain manner; the political question doctrine would bar such an intrusion into the executive branch's conduct of foreign relations. See Bancoult v. McNamara, 445 F.3d 427, 433 (D.C. Cir. 2006) ("'The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—"the political"—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.'" (quoting Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918))); Earth Island Inst. v. Christopher, 6 F.3d 648, 652–54 (9th Cir. 1993) (holding that the federal courts could not enforce a statute that purported to require the executive to initiate discussions with foreign countries).

[7]A court can dismiss claims based on mootness without first determining whether the claims ever presented a case or controversy.  See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 127 S. Ct. 1184, 1191 (2007) (explaining that a court may "choose among threshold grounds for denying audience to a case on the merits" (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999))).

Judicial Watch's complaint does not allege any specific facts regarding any future NACC meetings that will take place, that Judicial Watch seeks to attend, and that the Commerce Department could ensure that Judicial Watch could attend. The NACC is a private group, and the Commerce Department has no authority to compel the NACC, its Secretariat, or the private-sector members of the NACC to permit Judicial Watch to attend future meetings. Thus, Judicial Watch has not sufficiently alleged standing to raise any challenge related to any past or future meeting of the NACC.

### C.  Judicial Watch's Request for Relief Falls Outside the Court's Statutory Mandamus Jurisdiction Because It Requests an Order That Exceeds the Narrow Scope of Mandamus Relief.

Even if Judicial Watch's complaint presented a case or controversy within the scope of Article III, the Court would nevertheless lack jurisdiction over Judicial Watch's request for mandamus relief, because the relief that Judicial Watch requests is outside the scope of mandamus.

A Court's subject matter jurisdiction extends only as far as Congress has authorized by statute. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); Commodity Futures Trading Comm'n v. Nahas, 738 F.2d 487, 492 (D.C. Cir. 1984). The mandamus statute, 28 U.S.C. § 1361, authorizes district court jurisdiction over actions "in the nature of mandamus." Id. "Jurisdiction over actions 'in the nature of mandamus' under § 1361, like jurisdiction over the now-abolished petitions for writs of mandamus, is strictly confined. . . . [M]andamus is 'drastic'; it is available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief; and even if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary." In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (directing district court to

dismiss plaintiff's requests for FACA-related mandamus relief); see also Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 63 (2004) ("The mandamus remedy was normally limited to enforcement of 'a specific, unequivocal command,' the ordering of '"a precise, definite act . . . about which [an official] had no discretion whatever."'" (citations omitted) (alteration in original)).  Because mandamus jurisdiction is available only in cases where the remedy requested is in the nature of mandamus, "mandamus jurisdiction under § 1361 merges with the merits." Cheney, 406 F.3d at 729.

Judicial Watch's request for relief lies outside the Court's mandamus jurisdiction, because Judicial Watch does not seek an order compelling discrete acts that are "precise" and "definite."  So. Utah Wilderness Alliance, 542 U.S. at 63.  Rather, Judicial Watch asks for a blunderbuss order that would compel the defendants in vague terms "to perform carry out [sic] all nondiscretionary duties required by FACA."  Compl. at 13.  The order Judicial Watch requests would not compel a one-time act to be performed immediately, but would impose a continuing obligation governing future conduct and subject to the Court's continuing supervision.  Compl. at 13.  This request is not "in the nature of mandamus," so neither mandamus jurisdiction nor a  mandamus remedy is available to Judicial Watch.

**II.    Judicial Watch's Complaint Fails to State a Claim upon Which Relief Can Be Granted, Because the NACC Is Not Subject to the FACA, and the Administrative Procedure Act Does Not Authorize Suit Based on General Failure to Comply with a Statute.**

**A.    The Complaint Does Not Allege That the Commerce Department Was Involved in the Development of the NACC or Has Ever Exercised Control over the NACC in a Way That Would Trigger the Application of FACA.**

To withstand a motion to dismiss for failure to state a claim, the complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative

level on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (footnote omitted) (citations

omitted). In evaluating the sufficiency of the complaint, the Court considers only "the facts

alleged in the complaint, any documents either attached to or incorporated in the complaint and

matters of which [the Court] may take judicial notice." See EEOC v. St. Francis Xavier

Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). The rules of pleading require factual

allegations "plausibly suggesting," and "not merely consistent with," the elements of a valid

claim for relief. See Bell Atl. Corp., 127 S. Ct. at 1966.

Based on the facts stated in the complaint, the FACA simply does not apply to the

NACC, the U.S. component of the NACC, or the associated advisory council. The complaint

does not allege that the Commerce Department was involved in the NACC's creation or has ever

managed or controlled the NACC in a manner that could support a conclusion that the NACC

was "established or utilized" by the Commerce Department in a way that would trigger the

application of FACA. In addition, the FACA simply does not apply to organizations or

proceedings outside U.S. territory or bodies convened in conjunction with foreign governments.

FACA applies to bodies qualifying as "advisory committee[s]." 5 U.S.C. app. § 4(a)

(applying FACA to "each advisory committee," with some exceptions). To be an "advisory

committee," a group must be "established or utilized" by the government within the meaning of

§ 3(2):

> (2) The term "advisory committee" means any committee, board, commission,
> council, conference, panel, task force, or other similar group, or any
> subcommittee or other subgroup thereof (hereafter in this paragraph referred to as
> "committee"), which is—
>
> (A) established by statute or reorganization plan, or
>
> (B) established or utilized by the President, or

(C) <u>established or utilized</u> by one or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government, and (ii) any committee that is created by the National Academy of Sciences or the National Academy of Public Administration.

<u>Id.</u> (emphasis added).

The Supreme Court interpreted this provision in <u>Public Citizen v. U.S. Department of Justice</u>, 491 U.S. 440 (1989), which dealt with the Justice Department's consultations with an American Bar Association (ABA) committee in the judicial nomination process. The Court recognized that the terms of § 3(2), if taken literally, could lend themselves to an expansive interpretation that could encompass "any formal organization[] from which the President or an Executive agency seeks advice." <u>Pub. Citizen</u>, 491 U.S. at 452. But the Court concluded that Congress clearly did not intend the statute to reach that broadly. The Court wrote, "FACA was enacted to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals; although its reach is extensive, we cannot believe that it was intended to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice." <u>Pub. Citizen</u>, 491 U.S. at 453.

Accordingly, the Court concluded that Congress included the term "utilized" in the FACA so that the statute not only covered government-created committees, but also reached a narrow class of privately formed committees. <u>Id.</u> at 462. However, the Court concluded that a privately formed committee "not amenable to . . . strict management by agency officials" would not fall within the reach of the statute. <u>Id.</u> at 457–58. Hence, even though the Justice Department undoubtedly "utilized" the ABA committee in a common sense, the committee was not an "advisory committee" subject to FACA. <u>See id.</u> at 452, 463–65.

In keeping with this approach, the D.C. Circuit has consistently accorded a restrictive interpretation to the terms "established" and "utilized." See generally Byrd v. U.S. EPA, 174 F.3d 239, 245–46 (D.C. Cir. 1999). The D.C. Circuit has determined that an advisory committee is "established" by the government only if it is "actually formed" by the government. Id. at 245 (citing Pub. Citizen, 491 U.S. at 452, 456–57). This means the government must do more than conceive, encourage, or facilitate the creation of the body in question. The government must actually select the group's members. Id. at 246–47 (finding that even though the EPA had conceived the need for a panel, had hired a private consulting firm to select and manage the panel, and had had considerable involvement and authority in the panel's selection, the fact that the panel's members were selected by the consulting firm and not directly by the EPA meant that the plaintiff "cannot show" that the panel was "established" by the EPA); Food Chem. News v. Young, 900 F.2d 328, 333 (D.C. Cir. 1990) (holding that an expert panel convened by a private scientific organization under contract with the FDA was not directly "established" by the FDA).

The D.C. Circuit has also elaborated on the Supreme Court's interpretation of the term "utilized." "The word 'utilized' . . . is a stringent standard, denoting something along the lines of actual management or control of the advisory committee." Wash. Legal Found. v. U.S. Sentencing Comm'n, 17 F.3d 1446, 1450 (D.C. Cir. 1994); see id. at 1451 (holding that an advisory group was not "utilized" by the Department of Justice even though the Department of Justice would have significant influence on the group's deliberations); Byrd, 174 F.3d at 247 ("[E]ven 'significant' influence does not represent the level of control necessary to establish that a government agency 'utilized' an advisory panel" (citing id.)); id. at 247–48 (concluding that the EPA's participation in the panel's activities did not amount to "actual management or control"); Food Chem. News, 900 F.2d at 333 (holding that an expert panel managed by a private

scientific organization under contract with the FDA was not "utilized" by the FDA).[8]

The complaint alleges that the NACC grew out of ideas conceived within the Security and Prosperity Partnership of North America (SPP), a joint initiative of the governments of the United States, Mexico, and Canada. Compl. ¶¶ 9–12. According to the complaint, the Secretary of Commerce and his Mexican and Canadian counterparts envisioned a group that "would provide recommendations on issues concerning North American competitiveness that could be addressed through the SPP" and that would "function[] as a conduit" between the Commerce Department and the business community. Compl. ¶ 10. The complaint states that Commerce Department "reportedly worked with" two private organizations and other interested parties to create the NACC "by facilitating interaction between representatives from the three governments and the private sector." Compl. ¶ 13. Two business groups, the Council of the Americas and the U.S. Chamber of Commerce, serve as the Secretariat for the U.S. component of the NACC, and the Mexican and Canadian components of the NACC are managed by separate Secretariats within their respective countries. Compl. ¶ 20. The members of the NACC include ten

---

[8]In its reply memorandum in support of its motion for a temporary restraining order, Judicial Watch contended that Byrd and Food Chemical News are distinguishable because those cases turned on the fact that FACA does not apply to persons or organizations that have contractual relationships with federal agencies. Judicial Watch simply misinterprets these two cases. In Food Chemical News, the parties agreed that the Federation of America Societies for Experimental Biology (FASEB), the organization working for the FDA under contract, was not subject to FACA. See Food Chem. News, 900 F.2d at 331 ("We start with a key point that is not in dispute: FASEB and its Life Science Research Office do not figure in this case as an 'advisory committee' subject to FACA . . . ."). The issue in the case was whether FACA applied to an expert panel that was convened by FASEB and was not covered by the contractor exception. See id. ("In the district court, plaintiffs successfully urged a distinction between FASEB, the contractor not subject to FACA, and the Task Order No. 3 expert panel."); id. at 333 (concluding that the expert panel was not established or utilized by the FDA). Similarly, in Byrd, the EPA entered a contract with ERG, a private consulting firm, to conduct a peer review of a study of health effects of benzene. Byrd, 174 F.3d at 241. The dispute in the case was not whether ERG was subject to the FACA, but whether the expert panel assembled by ERG was subject to the FACA. Id. at 242; see also id. at 241 (describing how the expert panel was assembled).

representatives from Mexico, ten representatives from Canada, and fifteen representatives from the United States.  Compl. ¶¶ 17–18.  The complaint does not allege that the Commerce Department had any role in selecting the members of the NACC or its U.S. component or that the Commerce Department has ever funded, managed, or otherwise controlled the NACC or its U.S. component.

The complaint alleges that the Commerce Department "ha[s] committed to 'ministerial-level' meetings with the NACC annually'" and that the NACC "meets with 'senior government officials two or three times per year' to 'engage on an on-going basis to deliver concrete results.'"  Compl. ¶ 21.  At a meeting in Ottawa, Canada, in February 2007, the NACC delivered a report containing policy recommendations for the Secretary of Commerce and his Mexican and Canadian counterparts in areas such as border-crossing facilitation, standards and regulatory cooperation, and energy integration.  Compl. ¶ 26.  The complaint also alleges that the U.S. component of the NACC "meets twice a year with the Secretary of Commerce and 'additional meetings at the working group level' are scheduled 'as needed.'"  Compl. ¶ 24.

The complaint also alleges that an advisory committee consisting of 200 U.S. businesses and business groups has been formed to support the U.S. component of the NACC.  Compl. ¶ 23.  The complaint does not allege that the Commerce Department had any involvement in establishing this advisory committee, has ever exercised any management authority or control over the advisory committee, or has ever funded the advisory committee.

These factual allegations fall far short of stating that the Commerce Department either "established" or has "utilized" the NACC within the meaning of the FACA.  At most, the complaint alleges that the Commerce Department and the U.S. government, in conjunction with Canadian and Mexican authorities, helped to conceive, encourage, and facilitate the creation of

the NACC.  This kind of involvement is not sufficient to qualify the NACC as a group

"established" by the Commerce Department or the President.  As explained above, under D.C.

Circuit precedent, the Commerce Department could be said to have "established" the NACC

only if it "actually formed" the NACC, meaning the Commerce Department directly selected the

members of the NACC.  Cf. People for the Ethical Treatment of Animals, Inc. v. Barshefsky,

925 F. Supp. 844, 848 (D.D.C. 1996) (denying preliminary relief based in part on a conclusion

that the U.S. Trade Representative's involvement in indirectly facilitating the creation of a group

was insufficient to bring the group within the reach of FACA).  Indeed, the complaint directly

states that at least 20 of the NACC's 35 members were selected within Canada and Mexico.  The

complaint also does not allege that the NACC is "utilized" by the Department of Commerce,

because none of the allegations in the complaint allege that the Commerce Department exercises

"actual management or control" over the NACC.  Cf. id. at 848–49 (finding that an international

working group composed of officials from different countries, not controlled by the U.S.

government, was not "utilized" by the U.S. Trade Representative for purposes of FACA).

Similarly, the complaint does not allege that the U.S. component of the NACC or its

advisory committee were "established" or have been "utilized" by the U.S. government.  The

complaint does not state that the Commerce Department selected the members of the U.S.

component of the NACC or had any role in establishing the associated advisory council.  The

complaint also does not suggest that the Commerce Department has ever exercised actual

management or control over either the U.S. component of the NACC or the advisory council.

**B.**     **The NACC, its U.S. Component, and the Associated Advisory Council Are Not Established or Utilized "In the Interest of Obtaining Advice or Recommendations" on Federal Policy.**

FACA § 3(2) further confines the definition of "advisory committee" to groups

24

established or utilized by the government "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. § 3(2). To qualify as an advisory committee, the group must furnish advice to the President or agencies or officers of the U.S. government on an "identified governmental policy." Judicial Watch v. Clinton, 76 F.3d 1232, 1233 (D.C. Cir. 1996); see, e.g., Sofamor Danek Group, Inc. v. Gaus, 61 F.3d 929, 934–35 (D.C. Cir. 1995); see also Consumers Union of U.S., Inc. v. Dep't of Health, Educ. & Welfare, 409 F. Supp. 473, 477 (D.D.C. 1976) (holding that presentation of a "voluntary, industry-sponsored proposal" was not advice to the agency), aff'd, 551 F.2d 466 (D.C. Cir. 1977). The furnishing of specific policy advice must be the group's primary purpose. See Judicial Watch v. Clinton, 76 F.3d at 1233 (focusing on the "primary activity" of the group).

    As described in the complaint, the NACC does not develop specific recommendations on an "identified governmental policy" exclusively or even primarily for the U.S. federal government. Rather, the NACC develops general recommendations for North American regional policy priorities targeted collectively at the governments of the United States, Canada, and Mexico. See Compl. ¶¶ 9–14 (describing the NACC's origins in the Security and Prosperity Partnership of North America, a joint initiative of the United States, Mexico, and Canada); Compl. ¶ 14 (quoting a press release stating that the NACC "will meet annually with representatives of the United States, Mexican, and Canadian governments 'to provide recommendations and priorities on promoting North American competitiveness globally'"). The NACC is simply not the kind of body whose operation Congress sought to regulate or curtail when it enacted the FACA. See Pub. Citizen, 491 U.S. at 445–46 (describing the purpose of FACA); id. at 463–64 (rejecting a "literalistic reading" that "would catch far more groups and

consulting arrangements than Congress could conceivably have intended").

The U.S. component of the NACC and the advisory council created by the U.S. NACC Secretariat also do not furnish advice to the federal government in a structured fashion. While members of the U.S. component of the NACC have met with the Secretary of Commerce, Judicial Watch's complaint alleges no specific facts suggesting that either group provides formal advice or recommendations independent of the larger NACC organization. See Nat'l Anti-Hunger Coal. v. Executive Comm. of the President's Private Sector Survey on Cost Control, 711 F.2d 1071, 1075 (D.C. Cir. 1983), aff'g 557 F. Supp. 524, 529 (D.D.C. 1983) (finding that task forces that advised a FACA advisory committee but did not themselves directly advise the President or any federal agency were not subject to FACA); cf. Ass'n of Am. Physicians & Surgeons v. Clinton, 997 F.2d 898, 913 (D.C. Cir. 1993) ("[A] group is a FACA advisory committee when it is asked to render advice or recommendations, as a group, and not as a collection of individuals."); Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (noting that in evaluating a complaint, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations.").

**C.    FACA Does Not Apply to Proceedings Held on Foreign Soil under the Auspices of Foreign Governments or Foreign Citizens Not Controlled by the U.S. Government.**

Even if Judicial Watch's interpretation of FACA were not already foreclosed by Supreme Court and D.C. Circuit precedent, other characteristics of the NACC, the U.S. component of NACC, and the U.S. NACC advisory council would preclude interpreting FACA to reach the groups. Judicial Watch effectively urges the Court to interpret FACA as applying to dealings with foreign government ministers and foreign private citizens and meetings taking place on

foreign soil.  Read in this manner, the statute would impose burdens on foreign cabinet ministers,

as well as on foreign private citizens who may have never visited the United States.  It would

further command the Commerce Department to enforce compliance by foreign citizens over

whom the Commerce Department has no authority.  Such a reading would violate several well-

established principles of statutory construction.

First, "[i]t is a longstanding principle of American law 'that legislation of Congress,

unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the

United States.'  This [canon] . . . serves to protect against unintended clashes between our laws

and those of other nations which could result in international discord." EEOC v. Arabian Am.

Oil Co., 499 U.S. 244, 248 (1991) (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 284–85

(1949)), discussed in Spector v. Norwegian Cruise Line Ltd., 125 S. Ct. 2169, 2182 (2005);

Small v. United States, 544 U.S. 385, 388–89 (2005).  FACA contains no indication of

Congressional intent to regulate the government's dealings with foreign ministries or foreign

private entities or the conduct of U.S. officials on foreign soil.

In addition, applying the stringent provisions of FACA to any and all dealings with

foreign governments and foreign citizens would impair the ability of the executive branch—in

this instance, specifically the Commerce Department—to engage in international consultation

and cooperation efforts with foreign government ministers and foreign citizens.  In the absence

of a clear statement, Congress should be presumed not to have intended such a drastic

interference with the executive branch's conduct of foreign relations.  The executive branch has

primary authority and responsibility for representing the United States in relations with other

nations.  Cf. Pub. Citizen, 491 U.S. at 465–67 (applying canon of constitutional doubt in

determining that FACA did not apply to Justice Department consultations with an American Bar

Association committee regarding judicial nominees); <u>United States v. Curtiss-Wright Exp. Corp.</u>, 299 U.S. 304, 319 (1936) ("In this vast external realm [of foreign relations], with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation.  He <u>makes</u> treaties with the advice and consent of the Senate; but he alone negotiates.  Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it."); U.S. Const. art. II, § 3 (President "shall receive Ambassadors and other public Ministers").

> **D.    Judicial Watch Has No Valid Cause of Action, Because Neither the Mandamus Act Nor the Administrative Procedure Act Permits a General Attack on Failure to Comply with the Statute.**

Judicial Watch's complaint does not state a valid claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706.  FACA does not create a private right of action, so a plaintiff attempting to challenge violations of FACA must invoke a private right of action provided by some other provision of law.  <u>Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group</u>, 219 F. Supp. 2d 20, 33 (D.D.C. 2002); <u>see also</u> <u>Cheney v. U.S. Dist. Court for the D.C.</u>, 542 U.S. 367, 374–75 (2004) (reciting this holding without remark in discussing the procedural background of the litigation); <u>see generally</u> <u>Alexander v. Sandoval</u>, 532 U.S. 275, 286–87 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be creeated by Congress.").  Thus, Judicial Watch's complaint attempts to enforce the FACA against the defendants through the Administrative Procedure Act or an action for mandamus.[9]

---

[9]Judicial Watch's complaint also invokes the Declaratory Judgment Act, 28 U.S.C. § 2201, Compl. ¶¶ 35–39, but the Declaratory Judgment Act does not provide a cause of action; it merely authorizes a form of relief.  <u>See</u> <u>Skelly Oil Co. v. Phillips Petroleum Co.</u>, 339 U.S. 667, 671 (1950) ("'[T]he operation of the Declaratory Judgment Act is procedural only.'" (quoting <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240 (1937)) (alteration in original)); <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500, 508–09 (1959) (noting that the Declaratory Judgment Act was designed to "leav[e] substantive rights unchanged").

Compl. ¶¶ 40–47.  As explained above, however, see supra section I.C, Judicial Watch fails to

present a claim that falls within the Court's mandamus jurisdiction or that can be remedied by

relief in the nature of mandamus.  For similar reasons, Judicial Watch cannot employ the

Administrative Procedure Act to challenge what it describes as a general failure to comply with

the terms of the FACA in its dealings with the NACC.

The Administrative Procedure Act permits review of "final agency action."  5 U.S.C.

§ 704.  Under some circumstances, "failure to act" may constitute final agency action, id.

§ 551(13), and a reviewing court can compel the unlawfully withheld action.  However, every

APA challenge, whether targeted at an "action" or a "failure to act," must have as its object some

"circumscribed, discrete agency action[]" to be invalidated or compelled.  Norton v. So. Utah

Wilderness Alliance, 542 U.S. 55, 62 (2004); see id. at 61–63; see also Lujan v. Nat'l Wildlife

Fed'n, 497 U.S. 871, 898–89 (1990) (holding that defendant was entitled to summary judgment

in APA action that failed to target an "identifiable action or event").

Judicial Watch's complaint does not challenge a discrete action the defendants have

taken or have not taken by a required deadline.  Instead, Judicial Watch complains of a broad,

continuing pattern of supposed noncompliance with the FACA statutory framework.  Compl.

¶ 37.  This is precisely the kind of mischief the APA's requirement of final agency action is

intended to prevent. As the Supreme Court wrote in Southern Utah Wilderness Alliance:

> If courts were empowered to enter general orders compelling compliance with
> broad statutory mandates, they would necessarily be empowered, as well, to
> determine whether compliance was achieved—which would mean that it would
> ultimately become the task of the supervising court, rather than the agency, to
> work out compliance with the broad statutory mandate, injecting the judge into
> day-to-day agency management.

542 U.S. at 66–67.  See also Nat'l Wildlife Fed'n, 497 U.S. at 898–99 (holding that the APA did

not provide a vehicle for reviewing the Bureau of Land Management's alleged failure to

"provid[e] information and permit[] public participation," even assuming that the BLM was required to provide such information and public access). Thus, the APA does not provide a vehicle for Judicial Watch's "broad programmatic attack," So. Utah Wilderness Alliance, 542 U.S. at 64, against the Commerce Department's dealings with the NACC, its U.S. component, and the associated advisory council. Judicial Watch's complaint does not challenge any specific, discrete action; it simply levels a "generic challenge," Nat'l Wildlife Fed'n, 497 U.S. at 890 n.2, against the Commerce Department's interactions with the NACC and the Commerce Department's position that the NACC is not subject to the FACA. See Compl. ¶ 41 (alleging that the agency has acted wrongfully by "establishing and utilizing the NACC and its U.S. component subcommittees" and "permitting the NACC and its U.S. component subcommittees . . . to meet and deliberate without complying with the FACA"); cf. Nat'l Wildlife Fed'n, 497 U.S. at 892–93 ("[F]laws in [an] entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.").

**E.    Even if Judicial Watch Stated a Valid Claim Based on a Violation of the FACA, There Would Be No Basis for an Order Requiring the Commerce Department to Produce Documents "Irrespective of" Statutory Exemptions to the Freedom of Information Act.**

Judicial Watch's complaint further requests that the Court compel the Commerce Department to produce certain NACC-related documents "irrespective of whether any such document otherwise is or could be exempt from disclosure under 5 U.S.C. §§ 552(b)(2), (5), or (7)–(9)," which establish statutory exemptions to the Freedom of Information Act. Even if Judicial Watch had any basis for seeking such documents based on the requirements of the FACA, there would still be no basis for an order that disregarded the FOIA statutory exemptions.

The FACA explicitly incorporates the statutory exemptions of FOIA.  5 U.S.C. app. § 10(b);

NRDC v. Johnson, 488 F.3d 1002, 1003 (D.C. Cir. 2007) (per curiam) ("FACA incorporates the

FOIA exemptions . . . ." (citing id.)); see also Food Chem. News v. Dep't of Health & Human

Servs., 980 F.2d 1468, 1472 (D.C. Cir. 1993) (interpreting FACA as requiring disclosure of

"nonexempt section 10(b) materials" (emphasis added)).

## CONCLUSION

For the reasons above, the Department of Commerce and the Secretary of Commerce

respectfully request that the Court dismiss this action for lack of subject matter jurisdiction or for

failure to state a claim upon which relief can be granted.

Dated: October 9, 2007                              Respectfully submitted,

                                                    PETER D. KEISLER
                                                    Assistant Attorney General

                                                    JEFFREY A. TAYLOR
                                                    United States Attorney

                                                    ARTHUR R. GOLDBERG
                                                    Assistant Branch Director

                                                    /s/ JAMES C. LUH
                                                    JAMES C. LUH
                                                    Trial Attorney
                                                    United States Department of Justice
                                                    Civil Division, Federal Programs Branch
                                                    20 Massachusetts Ave NW
                                                    Washington DC 20530
                                                    Tel: (202) 514-4938
                                                    Fax: (202) 616-8460
                                                    E-mail: James.Luh@usdoj.gov
                                                    Attorneys for Defendants

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JUDICIAL WATCH, INC., | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | )   Civil Action No. 07-cv-1446 (RMU) |
| U.S. DEPARTMENT OF COMMERCE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>ORDER</u>

The Motion to Dismiss for Lack of Subject Matter Jurisdiction or for Failure to State a

Claim filed by Defendants U.S. Department of Commerce and Carlos Gutierrez, Secretary of

Commerce, U.S. Department of Commerce, is hereby GRANTED.

Dated:

_____
RICARDO M. URBINA
UNITED STATES DISTRICT JUDGE