## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| 501 School Street, SW, Suite 500 | ) | |
| Washington, D.C.  20024, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1446 (RMU) |
| | ) | |
| U.S. DEPARTMENT OF COMMERCE, | ) | |
| 14th Street and Constitution Avenue, N.W. | ) | |
| Washington, D.C.  20230, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CARLOS GUTIERREZ, in his official capacity as | ) | |
| Secretary of the U.S. Department of Commerce, | ) | |
| 14th Street and Constitution Avenue, N.W. | ) | |
| Washington, D.C.  20230, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel, submits this opposition to Defendants' motion to dismiss this action for lack of subject matter jurisdiction (Fed. R. Civ. P. 12(b)(1)) or for failure to state a claim (Fed. R. Civ. P. 12(b)(6)).  A proposed order is attached.

## MEMORANDUM OF LAW

### INTRODUCTION

This case concerns Defendants' establishment of an advisory committee subject to the Federal Advisory Committee Act ("FACA").  5 U.S.C. App. 2.  Instead of answering Plaintiffs' complaint, Defendants have filed a motion to dismiss, arguing that Defendants' compliance with

FACA should essentially be immune from judicial review.  Defendants' position is without merit.

First, as demonstrated herein, Plaintiff has stated a claim upon which relief may be granted as Plaintiff has incurred an "informational injury," conferring standing to pursue this action.  In addition, Plaintiff has more than sufficiently pled its claims that Defendants violated FACA by establishing and utilizing the North American Competitiveness Council ("NACC") and its U.S. component subgroups without complying with the public disclosure provisions of that statute.  Accordingly, the motion to dismiss should be denied.  *See* Fed R. Civ. P. 8(a) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief"); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed . . . unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

## BACKGROUND

## I.     The Federal Advisory Committee Act

FACA sets out a "comprehensive scheme" designed "to control the creation and operation of advisory committees" within the executive branch.  *Center for Auto Safety v. Cox*, 580 F.2d 689, 692 (D.C. Cir. 1978).  The central purpose of FACA is to "control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals and groups."  *Cummock v. Gore*, 180 F.3d 282, 285 (D.C. Cir. 1999) (citations omitted); *see* 5 U.S.C. App. 2 § 2.  This is because advisory committees are too often "dominated by representatives of industry and other special interests seeking to advance their own agendas."  *Id* . at 284-85 (citing H.R. REP. NO. 92-1017 (1972), *reprinted in* 1972

U.S.C.C.A.N. 3491, 3496 ("One of the great dangers in the unregulated use of advisory

committees is that special interest groups may use their membership on such bodies to promote

their private concerns.").

FACA imposes a number of requirements on committees established or utilized by the

President or federal agencies to obtain advice or recommendations ("advisory committees").  5

U.S.C. App. 2 § 2 *et seq*.  FACA defines "advisory committee," in relevant part, to include any

"committee, board, commission, council, conference, panel, task force, or other similar group, or

any subcommittee or other subgroup thereof  . . . established or utilized by one or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies

or officers of the Federal Government."  5 U.S.C. App. 2 § 3(2).

Advisory committees that meet this definition are subject to FACA's requirements unless

specifically exempted by statute.  *Id.* at § 4.  These requirements include, but are not limited to,

the following:  (i) that all meetings be open to the public; (ii) that notice of each meeting be

published in the Federal Register; (iii) that interested persons be allowed to attend, appear before,

or file statements with the advisory committee; and (iv) that records, reports, transcripts, minutes,

appendices, working papers, drafts, studies, agendas, and other documents made available to or

prepared for or by the advisory committees be made available through the provisions of FOIA.

*See*, *e.g.*, 5 U.S.C. App. 2 §§ 10(a)(1-3) and (b).

## II.     Relevant Facts

### A.     Establishment and Membership of the NACC.

On March 23, 2005, U.S. President George W. Bush, Mexican President Vincente Fox,

and Canadian Prime Minister Paul Martin reportedly met in Waco, Texas for a summit of North

American leaders.  Compl. ¶ 9.  The principal outcome of this meeting was the creation of the

Security and Prosperity Partnership of North America ("SPP"), which has been described as a

cooperative effort of the governments of the United States, Mexico, and Canada to address

numerous areas of mutual concern, including the movement of goods, traveler security, energy,

environment, and health.  *Id.*

Subsequently, on March 15, 2006, Defendant Gutierrez, Canadian Deputy Minister of

Industry Suzanne Hurtubise, and Dr. Alberto Ortega, a representative of Mexican President

Vicente Fox, met with senior business leaders in Washington, D.C. to solicit the views of the

North American business community on priorities for the SPP, as well as recommendations from

business leaders on how the SPP could help their companies become more competitive, reduce

the cost of doing business, cut red tape, and eliminate unnecessary barriers to trade in North

America.  Compl. ¶ 10.  Also discussed was the possible creation and institutionalization of a

"North American Competitiveness Council."  *Id.*

Following this March 15, 2006 meeting, a framework for the NACC was reached

trilaterally.  Compl. ¶ 11.  It was agreed that the NACC would provide recommendations on

issues concerning North American competitiveness that could be addressed through the SPP.  *Id.*

On March 30-31, 2006, President Bush, President Fox, and Prime Minister Harper held a

series of meetings in Cancun, Mexico to discuss various North American priorities, including the

SPP and "North American Competitiveness." Compl. ¶ 12.  One meeting between President

Bush, President Fox, Prime Minister Harper, and private sector representatives from each country

addressed the proposed structure of the NACC.  *Id.*  Subsequent to these meetings, Defendant

U.S. Department of Commerce reportedly worked with the Council of the Americas, the U.S.

4

Chamber of Commerce, and other interested parties to formalize the NACC by facilitating interaction between representatives from the three governments and the private sector. *Id.* at 13.

On June 15, 2006, Defendant Gutierrez, Mexican Economy Minister Sergio Garciade Alba, Canadian Minister of Interior Maxime Bernier, and North American business leaders met in Washington, D.C. to officially launch the NACC. Compl. ¶ 14. According to a press release issued by Defendant U.S. Department of Commerce, on that same date, the NACC "is made up of high level business leaders from each country" who will meet annually with representatives of the United States, Mexican, and Canadian governments "to provide recommendations and priorities on promoting North American competitiveness globally." *Id.* According to the U.S. Chamber of Commerce, Secretary Gutierrez expressed a desire to "institutionalize" the SPP and the NACC, so that its work will continue through changes in administrations. *Id.*

As officially launched by Defendant Gutierrez and his counterparts in Mexico and Canada on June 15, 2006, the NACC  is comprised of thirty-five (35) members of the business community. Compl. ¶ 15. Each country determines its own members and the membership selection process. *Id.* The U.S. component of the NACC is comprised of fifteen (15) members, all of which are large, for-profit corporations.[1] *Id.* The Mexican and Canadian components of the NACC are comprised of ten (10) members each, all of whom appear to be heads of major Mexican and Canadian business interests. *Id.* at 17. None of the NACC's members are full-time officers or employees of the U.S. government. *Id.* at 19. A complete list of members of the NACC is attached as Exhibit A to the Complaint.

---

[1]    Prior to the June 15, 2006 launch of the NACC, an organizational meeting of the U.S. section of the NACC had been held on May 26, 2006, attended by Defendant Gutierrez and more than one hundred business leaders and government officials and employees. Compl. ¶ 16.

Defendants, as well as the governments of Mexico and Canada, each designated organizations in their respective countries to serve as "Secretariats" and to help collect input from the business community. Compl. ¶ 20. Defendants selected two business groups, the Council of the Americas and the U.S. Chamber of Commerce, to serve jointly as the "Secretariat" for the United States. *Id.*

According to the U.S. Chamber of Commerce, Defendants, as well as the governments of Mexico and Canada, have committed to participate in "ministerial-level" meetings with the NACC annually. Compl. ¶ 21. The NACC also meets with "senior government officials" "two to three times per year" to "engage on an on-going basis to deliver concrete results." *Id.*

Also according to the U.S. Chamber of Commerce, the U.S. component of the NACC is composed of an Executive Committee and an Advisory Committee. Compl. ¶ 22. The Executive Committee is comprised of the fifteen (15) U.S. members of the NACC. *Id.* Each member is charged with representing the sector in which its business operates. *Id.* The Advisory Committee is comprised of more than 200 U.S. corporations, business associations, and local chambers of commerce. *Id.* The Advisory Committee provides advice and recommendations to the Executive Committee. *Id.* at 23. Also according to the U.S. Chamber of Commerce, the U.S. component of the NACC, which refers to the Executive Committee, meets twice a year with the Secretary of Commerce and "additional meetings at the working group level" are scheduled "as needed." *Id.* at 24.

The NACC met on August 15, 2006 in Washington, D.C. Compl. ¶ 25. This apparently was the first formal meeting of the NACC. *Id.* Subsequently, Defendant Gutierrez and his counterparts from Mexico and Canada, met with the NACC on February 23, 2007 in Ottawa,

Canada. *Id.* at 26. At this meeting, the NACC issued a report containing over fifty (50) recommendations regarding border-crossing facilitation, standards and regulatory cooperation, and energy integration. *Id.* That same day, Defendant Gutierrez and his counterparts in Mexico and Canada issued a press release acknowledging their receipt of the NACC's report and recommendations. *Id.* The press release that states that "[o]ur respective governments will review the report and consider carefully its recommendations in preparation for the next leaders' meeting." *Id.* The press release further states that "[w]e will continue to work with the NACC and other stakeholders as we strive to make North America the safest and best place to live, invest and prosper." *Id.*

The Complaint also alleged that a "leaders" meeting was alleged to be scheduled for August 20-21, 2007 in Montebello, Canada. Compl. ¶ 27. The Complaint further alleged, upon information and belief, that the NACC also was to be meeting on or about these same dates in Montebello, Canada, in conjunction with the "leaders" meeting. *Id.*

**B.    Plaintiff's Investigation of the NACC.**

In furtherance of its public interest mission, Plaintiff began investigating the activities of the SPP and the NACC in approximately July 2006. Compl. ¶ 28. In August 2006, Plaintiff sent Freedom of Information Act ("FOIA") requests to various federal agencies, including Defendant U.S. Department of Commerce, seeking access to records regarding the creation, membership, operating guidelines, and meetings of the NACC, among other topics. *Id.* Plaintiff subsequently made further FOIA requests to various federal agencies, including again Defendant U.S. Department of Commerce, seeking access to additional records regarding the NACC. *Id.*

On March 23, 2007, Plaintiff submitted a request to the U.S. Chamber of Commerce, one of the organizations designated by Defendants to serve as Secretariat for the U.S. component of the NACC, asking that it be allowed to "participate in all future meetings of the NACC, to include Ministerial, Executive Committee and Advisory Committee meetings." Compl. ¶ 29.  By letter dated April 19, 2007, the U.S. Chamber of Commerce informed Plaintiff that only invited officials and members of the Executive Committee of the NACC could participate in "Ministerial" meetings. *Id.* at ¶ 30.  The U.S. Chamber of Commerce also informed Plaintiff that membership in the Executive Committee was "by definition only open to companies" and that the Advisory Committee is "only open to companies, sectoral associations, and local chambers of commerce." *Id.*

Subsequently, on July 26, 2007, Plaintiff submitted a request to Defendants asking that they acknowledge that the NACC and its U.S. component subcommittees are advisory committees under FACA.  Comp. ¶ 31.  Plaintiff's letter also requested Defendants bring the NACC and its U.S. component subcommittees into compliance with all appropriate laws and regulations, including FACA's requirements that meetings be open to Plaintiff and members of the public and that all records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agendas, or other documents made available to or prepared by the NACC and its U.S. component subcommittees be made available to Plaintiff pursuant to the provisions of FOIA. *Id.*

As a not-for-profit, tax exempt, educational organization that seeks to promote integrity, transparency, and accountability in government, Plaintiff has been and continues to be damaged by Defendants' refusal to allow it access to the meetings and records of the NACC and its U.S. component subcommittees.  Compl. ¶ 33.  Not only has Defendants' refusal thus denied Plaintiff

the ability to obtain information and records about the SPP and the NACC, but it also  is

restricting Plaintiff's ability to disseminate such information and records to the public and is

limiting Plaintiff's ability to carry out its public interest mission in general.  *Id.*

Moreover, public confidence in the integrity of the U.S. government as a whole has been

and will be harmed by the appearance that Defendants are meeting with and obtaining

recommendations and advice from a few, select members of major corporations, each with their

own self interests, in order to formulate government policy.  Compl. ¶ 34.  Defendants' actions

also create the appearance that members of the NACC and its U.S. component subcommittees

may gain favor or influence with Defendants and/or the U.S. government by participating in the

NACC process, to the detriment of others who are not allowed to participate, thus further

undermining public confidence in government.  *Id.*

## ARGUMENT

### III.    This Court Has Subject Matter Jurisdiction As Plaintiff Has Standing To Bring This Action.

A party does not need to assert any other cause of action other than to bring a FACA

claim directly.  According to the D.C. Circuit:

> [T]he government's obligation to make documents available under FACA does
> not depend on whether someone has filed a FOIA request for those documents
> . . . .the government's duty to disclose is otherwise independent of FOIA.  We
> think it follows that a plaintiff does not have to file a formal FOIA request before
> bringing an action seeking a remedy for alleged FACA violations, including
> violations of the statute's disclosure requirements.

*NRDC v. Johnson*, 488 F.3d 1002, 1003 (D.C. Cir. 2007).

A.        **Plaintiff Has Suffered an Injury in Fact.**

Both the U.S. Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have defined a FACA-related injury-in-fact as the "refusal to permit [the requestor] to scrutinize the [advisory committee's] activities to the extent FACA allows." *See Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989); *see also Byrd v. U.S. Environmental Protection Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999). This refusal "constitutes a sufficiently distinct injury to provide standing to sue." *Id.* In this case, by denying Plaintiff access to the meetings and records of the NACC and its U.S. component subgroups, Defendants directly caused Plaintiff's informational injury.[2] Compl. ¶¶ 31-33. Defendants, therefore, can make no serious challenge to the injury and causation elements of Plaintiff's standing. *See Food Chem. News v. Department of Health & Human Servs.*, 980 F.2d 1468, 1469 (D.C. Cir. 1992) ("Whenever practicable, all [Federal Advisory Committee] materials must be available for public inspection and copying before or on the date of the advisory committee meeting to which they apply."). A FACA plaintiff demonstrates standing by showing that it sought and was denied specific agency records.[3] *NRDC v. Johnson*, 488 F.3d 1002, 1003 (D.C. Cir. 2007).

---

[2]        Defendants "miss the forest for the trees." In asserting that Plaintiff has failed to demonstrate injury-in-fact, Defendants focus too narrowly on only Plaintiff's request for records. Similarly, in regard to any injury is fairly traceable or redressable, Defendants focus too narrowly on only Plaintiff's request to attend or participate in the August 20-21, 2007 NACC meeting that took place in Montebello, Canada. Defendants fail to consider the Plaintiff's claims, and Plaintiff's injuries, as a whole.

[3]        Defendants assert that Plaintiff failed to seek "specific agency records." Memorandum of Points and Authorities in support of Motion to Dismiss for Lack of Standing or Failure to State a Claim (Defs.' Mem.) at 11, 12. Defendants, however, have never expressed to Plaintiff any kind of uncertainty as to what was sought in the July 26, 2007 letter or asked for any kind of clarification. In fact, Defendants seem to concede FACA's applicability by claiming that, in response to the July 26, 2007 letter, Defendants are processing Plaintiff's request for

**B.**    **Plaintiff's Injuries Are Fairly Traceable to Defendants and Are Redressable by an Order of This Court.**

Defendants' motion to dismiss appears to address the second two standing requirements together. *See* Defs.' Mem. at 14, 15. However, upon close examination, Defendants fail to make any "fairly traceable" or causation argument. Rather, Defendants focus solely on their assertion that Plaintiff's injuries are not redressable by an order of the Court. Defendants are incorrect.

First, FACA violations in and of themselves warrant declaratory relief which can be redressed by the Court. *See Byrd*, 174 F.3d at 244 ("declaratory relief will redress [plaintiff's] injury because it will provide him with this Court's declaration that the agency failed to comply with FACA."). Therefore, Defendants' overall failure to comply with FACA can be redressed through declaratory relief by the Court.

Second, Defendants have yet to comply with 5 U.S.C. App. 2 § 10(b) and make available all of the records of the NACC and its U.S. component subgroups. Defendants' failure to comply with 5 U.S.C. § 10(b) can be redressed by the Court through both declaratory and injunctive relief -- declaring Defendants to be in violation of 5 U.S.C. App. 2 § 10(b) and ordering Defendants to comply with FACA.

Third, Defendants plainly do not intend to take any steps to allow Plaintiff to attend and/or participate in future meetings of the NACC or its U.S. component subgroups.[4] While

---

documents as provided under FACA "pursuant to the provisions of FOIA" and are "continuing to process" the request. Defs.' Mem. at 12-13.

[4]    Defendants' complaint that Plaintiff failed to allege any "specific facts" regarding future NACC meetings rings hollow. FACA does not require Plaintiff or any member of the public to have an advance agenda or calendar of events to receive FACA's benefits. In fact, it is reasonable to presume that this is why FACA requires the agency to publish the dates of future meetings in the Federal Register. 5 U.S.C. App. 2 § 10(A)(2).

11

Defendants claim that no order of this Court can "assure" Plaintiff access to such meetings, an order of this Court can compel Defendants to take all steps within their power ensure such a result. Accordingly, Plaintiff has standing to maintain this action.[5]

### C.    This Action is Not Moot.

Defendants' assertion that this case is moot is erroneous. Defs.' Mem. at 16-17. As demonstrated above, Plaintiff has suffered and is suffering several concrete informational injuries. In *Byrd*, the D.C. Circuit held that "even the availability of a 'partial remedy' is 'sufficient' to prevent [a] case from being moot." 174 F.3d at 244. In this case, more than just a "partial remedy" is available. This Court may order the release of the records of the NACC and its U.S. component subgroups, as well as order Defendants to make all future meetings open to Plaintiff and the public. Accordingly, this case presents an on-going case and controversy.

## II.    Plaintiff Has Stated Claims For Which Relief May Be Granted.

### A.    Plaintiff Has Adequately Alleged That The NACC Was "Established" And "Utilized" By Defendants As Those Terms Are Defined Under FACA.

Plaintiff has specifically pled the factual allegation that Defendants "established" and are "utilizing" the NACC and it U.S. component subcommittees as advisory committees. Compl. § 36. This "short and plain" factual statement alone satisfies the pleading requirement of Fed. R. Civ. P. 8(a).

---

[5]    Defendants make a curious assertion that, even if Plaintiff established standing "on its own behalf, Judicial Watch would lack standing to seek an order requiring the Commerce Department to open NACC records and proceedings to the public more generally." Defs' Mem. at 13. Plaintiff's complaint seeks an order requiring Defendants to comply with FACA. FACA clearly states that advisory committee meetings and preparatory materials should be "***open to the public.***" 5 U.S.C. App. 2 §§ 10(a) and (b) (emphasis added).

Plaintiff also has sufficiently pled numerous additional and specific factual allegations regarding Defendants' establishment and utilization of the NACC and its U.S. component subgroups, as those terms are defined by FACA.  5. U.S.C. App. 2 § 3(2).  These allegations set forth in detail the role of Defendants in establishing the NACC.  First, Defendant Gutierrez met with "senior business leaders" in March 2006, to solicit their views regarding how government could "help their companies become more competitive, reduce the cost of doing business, cut red tape, and eliminate unnecessary barriers to trade in North America."  Compl. ¶ 10.  A part of the same discussion was the possible creation and institutionalization of a "North American Competitiveness Council."  *Id.*  Subsequent to this meeting, Defendants laid the groundwork by creating the "framework" for the NACC.  Compl. ¶ 11.  Defendant Department of Commerce then "worked with private sector interest groups, the Council of the Americas and the U.S. Chamber of Commerce, and other interested parties to formalize the NACC . . . ."  *Id.* at 13.  The express purpose of the NACC was to "provide recommendations [to Defendants] on issues concerning North American competitiveness . . . ."  *Id.*

As alleged in Complaint, the NACC was, to use Defendants' own word, "launched" by Defendant Gutierrez at a meeting on June 15, 2006.  *Id.* at 14.  The press release issued that day by Defendant Department of Commerce confirmed that the NACC "is made up of high level business leaders from each country" who will meet annually with Defendants "to provide recommendations and priorities on promoting North American competitiveness globally."  *Id.*  At the same meeting, Defendant Gutierrez "expressed a desire to 'institutionalize' . . . . the NACC, so that work will continue through changes in administration."  *Id.*  Hence, Plaintiff has more than sufficiently pled when, why, and how Defendants "established" the NACC.

13

Plaintiff have pled even more specific allegations regarding the establishment and utilization of the U.S. component of the NACC.  Specifically, Defendants launched the U.S. section of the NACC at meeting on May 26, 2006, a meeting attended by more than 100 business leaders and government officials and employees.  *Id.* at 16.  The U.S. component of the NACC is comprised of 15 members, all of which are large, for-profit corporations.  *Id.*  As also alleged by Plaintiff, Defendants selected two business groups, the Council of the Americas and the U.S. Chamber of Commerce, to serve as a "Secretariat" for the U.S. component of the NACC.  *Id.* at 20.  Even more specifically, according to the U.S. Chamber of Commerce, the U.S. component of the NACC is composed of an Executive Committee and an Advisory Committee.  *Id.* at 22. The Executive Committee is comprised of the fifteen (15) U.S. members of the NACC.  *Id.*  Each member is charged with representing the sector in which its business operates.  *Id.*  The Advisory Committee is comprised of more than 200 U.S. corporations, business associations, and local chambers of commerce.  *Id.*  The Advisory Committee provides advice and recommendations to the Executive Committee.  *Id.* at 23.  Also according to the U.S. Chamber of Commerce, the U.S. component of the NACC, which refers to the Executive Committee, meets twice a year with the Secretary of Commerce and "additional meetings at the working group level" are scheduled "as needed."  *Id.* at 24.

These are highly detailed, specific factual allegations setting forth Defendants' role in the establishment and use of advisory committees – the NACC, the Executive Committee, and the Advisory Committee.  The alleged purpose of these committees is to provide policy recommendations to Defendants.  Defendants are alleged to have planned and then "launched"

14

the NACC and, just as significantly, the Executive Committee and the Advisory Committee.[6]
Plaintiff provides specific factual allegations even to exact size and composition of NACC and
each subgroup. Plaintiff furnishes even additional allegations regarding specific meetings and
policy recommendations to be provided to Defendants.

In short, the Complaint sets forth numerous detailed and specific allegations concerning
how the NACC and its subgroups were established by Defendants and how they are being
utilized by Defendants. These specific factual allegations are more than sufficient to satisfy the
pleading requirements necessary to survive any motion to dismiss. *See Conley v. Gibson*, 355
U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed . . . unless it appears beyond
doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him
to relief").

B.    **The Statutory Language and Existing Precedent Support Plaintiff's
      Allegations As To The "Establishment and Utilization" Of The NACC.**

The plain language of FACA defines an advisory committee as any committee that is
"established or utilized" by an agency for the purpose of obtaining "advice or recommendations"
for that agency. This is precisely what both NACC and its U.S. component subgroups are.

Defendants contend that a committee created in conjunction with other parties, such as in
this case two foreign governments, somehow allows an agency to escape this plain statutory
requirement. Defs.' Mem. at 15-16, 23-24. Such an interpretation, if endorsed by this Court,
would quickly render the statute a nullity.

_____

[6]      *See* 5 U.S.C. App. 2 § 3(2) ("advisory committee" includes "any subcommittee or
other subgroup thereof  . . . established or utilized by one or more agencies, in the interest of
obtaining advice or recommendations for the President or one or more agencies or officers of the
Federal Government.").

Under Defendants' theory, an agency could evade FACA's requirements quite easily by, for example, inviting any other entity – a corporation, special interest groups, or foreign government – to "jointly" participate in the formation of an advisory committee. Alternatively, an agency could simply hold meetings of any advisory committee outside the United States, and then claim that no court has no jurisdiction over such activities. The agency might further try to insulate itself from FACA by appointing only a minority of the members of the committee, or it could even delegate that task to interested parties, such as special interest groups, and then claim it no longer has control over the committee, allowing special interests groups it selected to run the committee behind closed doors. The result would be that the agency would receive the recommendations from the committee that it was purposefully seeking, having avoided public scrutiny and the strictures of FACA. Such a gaping loophole, if it existed, would be completely inconsistent with the purpose of FACA and open government laws in general.

The above scenario is precisely what has occurred in this case. After playing a direct and indispensable role in "launching" the NACC and its U.S. component subgroups, Defendants have refused to accept the applicability of FACA to their creations. Defendants contend that, by forming a committee in conjunction with foreign governments, FACA does not apply. Defs. Mem. at 24. Defendants predictably cite their delegation of "control" of the committee, including the selection of individual members, to third parties, in this case two special interest groups, as another reason FACA should not apply. *Id.* Defendants also argue that the Court has

no authority to intervene as Defendants' committee is meeting on foreign soil.[7]  Defs.' Mem. at

26-28.

 Defendants' sole citation of authority is a case which, while superficially similar, is

distinctly different from this case.  Defendants rely on *People for the Ethical Treatment of*

*Animals v. Barshefsky*, 925 F. Supp. 844 (D.D.C. 1996), in which this Court determined that an

"international working group" did not fall under FACA.  *Barshefsky* involved a "working group

of experts" charged with developing an international technical standard for the humane trapping

of animals.  *Id.* at 845.  In an effort to prevent an international trade dispute, the United States

and other countries formed the working group to set agreed-upon standards.  *Id.*  The U.S.

delegation consisted of experts from two federal agencies and experts selected by three U.S.

states.  The Court concluded that the agency (the Office of the United States Trade

Representative) had only "indirectly facilitated the formation" of the working group.  *Id.*  The

Court further held that the working group was not "advisory in nature" as it did not formulate

policy recommendations.  According the Court, there was not "any evidence which would lead to

---

[7] Defendants' assertion of international sovereignty and political question doctrines
are simply red herrings.  This Court unquestionably has the authority to order Defendants to
comply with FACA's requirements.  Defendants' reliance on *Oetjen v. Cent. Leather Co.*, 246
U.S. 297, 302 (1918) as quoted on *Bancoult v. MacNamara*, 455 F.3d 427, 433 (D.C. Cir. 2006)
is misplaced.  As set forth in *Zweibon v. Mitchell*, 516 F.2d 594, 620 (D.C. Cir. 1975), the D.C.
Circuit held that "foreign relations" language of *Oetjen* has a very narrow, factually-specific
application, specifically that the language of *Oetjen* should not be "divorced from its factual
predicates . . . [*Oetjen* was] basically [an] 'act of state' case[], and the sole presidential decision
that was given conclusive force concerned who was to be considered the lawful sovereign power.
Once the legitimate sovereign is determined, the act of state doctrine precludes his acts from
being reexamined by the courts of another sovereign state." 516 F.2d at 620.  This clearly is not
the question presented here.

the conclusion that the working group advises or makes recommendations to any federal agency." *Id.*

In contrast, while the agency in *Barshefsky* only "indirectly facilitated" the formation of the working group, the Defendants in this case have publicly claimed credit for "launching" the NACC and its U.S. component subgroups. Furthermore, the express purpose of the NACC and its U.S. component subgroups is to develop and provide policy recommendations to Defendants. In *Barshefsky*, the working group was not "advisory in nature" and did not make recommendations to federal agencies. Moreover, the working group in *Barshefsky* was composed of experts selected by the federal and state governments. In contrast, the NACC and its U.S. component subgroups consist solely of "private individuals and groups" (*see Cummock v. Gore*, 180 F.3d at 285)) organized specifically to develop policy recommendations for Defendants and to do so on a continuing basis. Accordingly, the working group in *Barshefsky* is far different than the policy-recommending NACC and its U.S. component subgroups. FACA is intended to apply to just such committees established and utilized by the federal government.

Significantly, the U.S. General Service Administration ("GSA"), the federal agency charged with administering FACA (5 U.S.C. app. 2 § 7), has issued guidelines to assist agencies in determining when FACA applies. These guidelines, entitled "When FACA Is and Is Not Applicable to Interactions with The Private Sector," are available on the agency's website and a copy is attached hereto as Exhibit A.

To assist an agency, GSA describes various hypothetical scenarios under which an agency may establish a FACA advisory committee. In strikingly similar fact pattern to the facts alleged in this case, the GSA considers a committee that is created by an agency head and is composed of

"senior corporate officials which will meet, interact, deliberate, and advise him on a variety of issues . . . ." Exh. A. at 2. The committee structure also includes "a core membership with subgroups."

According to the GSA, such a committee constitutes a FACA advisory committee. This is because "[t]he committee is established by an agency head (the Administrator) to obtain advice or recommendation for himself of other federal officials in the executive branch; and the committee is not composed wholly of full-time, or permanent part-time federal employees." For these reasons, the agency must abide by all the requirements of FACA.

GSA's hypothetical example is this case. As alleged in the Complaint, Defendants wish to receive recommendations from various "corporate officials." Defendants established and are utilizing the NACC and its U.S. component subgroups to develop and provide such recommendations. Based upon these alleged facts, the NACC and its U.S. component subgroups are governed by FACA. Hence, even the federal agency with unique expertise in interpreting FACA rejects Defendants' arguments.

**C.    In Addition Plaintiff's Declaratory Judgment Act and APA Claims, Plaintiff May Also Pursue A Claim Under the Mandamus Act.**

In addition to its claims under the Declaratory Judgment Act and the APA, Plaintiff has presented a claim under the Mandamus Act, 28 U.S.C. § 1361. Compl. ¶¶ 44-47. As the D.C. Circuit has explained, mandamus relief is available where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997). In this case, Plaintiff alleges that Defendants are failing to carry out a "clear

duty" owed to Plaintiff by failing to disclose records and open the meetings of the NACC and its

U.S. component subgroups as required under FACA.  Accordingly, Plaintiff has adequately

alleged facts that may entitle Plaintiff to relief through mandamus.

## Conclusion

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion

to dismiss.

Dated: November 6, 2007                    Respectfully submitted,

JUDICIAL WATCH, INC.


/s/  Paul J. Orfanedes_____
D.C. Bar No. 429716
/s  James F. Peterson_____
D.C. Bar No. 450171
Meredith L. Di Liberto
D.C. Bar No. 487733
Suite 500
501 School Street, S.W.
Washington, D.C.  20024
(202) 646-5172

*Attorneys for Plaintiff*

When is Federal Advisory Committee Act (FACA) Applicable?    Page 1 of 3

Case 1:07-cv-01446-RMU    Document 14-2    Filed 11/06/2007    Page 1 of 3

Back to Original

 **U.S. General Services Administration**

**Committee Management Secretariat**
(202) 273-3556
Fax (202) 273-3559
cms@gsa.gov

When FACA Is and Is Not Applicable To Interactions with The Private Sector

## INTRODUCTION

FACA was enacted in 1972 to control the growth and operation of the "numerous committees, board, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government." 5 U.S.C. App. 1, § 2(a).

When initially enacted FACA assigned to the Office of Management and Budget (OMB) responsibility for government oversight of advisory committees. In 1977 President Carter, acting pursuant to a congressionally approved reorganization plan, transferred the advisory committee functions from OMB to the General Services Administration (GSA). (See Executive Order 12024.) The statutorily mandated Committee Management Secretariat (CMS) therefore, also was transferred to GSA to carry out this responsibility.

As part of its responsibility under FACA, GSA issues governmentwide guidelines and regulations for Federal Advisory Committee Management.

## ILLUSTRATIVE SCENARIOS

The attachments contain scenarios which illustrate when FACA does and does not apply to interactions between Executive branch officials and the private sector. An overview of the process when FACA applies is also included.

## SCENARIO ONE - FACA NOT APPLICABLE

**Factual assumptions:** As part of continuing National Performance Review (NPR) initiatives, the Administrator wishes a series of meetings with senior corporate executives from companies which have faced or are facing challenges similar to those facing government today, e.g., downsizing, restructuring, reduced resources, creative financing needs, labor and human resources concerns, increased customer relations demands, etc.

The Administrator's intent is to obtain experiential and anecdotal information from each executive on challenges faced by his/her company, how the company met the challenges, approaches which were productive or successful, and those which were not. The attendees may or may not change from session to session. The specific agenda subjects will likely change and may be set in advance or be free form. No consensus advice or recommendations resulting from group deliberation or interaction is expected or will be solicited.

**FACA does not apply because:**

- The intent is to obtain information or viewpoints from individual attendees as opposed to

advice, opinions or recommendations from the group acting in a collective mode.

**FACA coverage could become an issue if:**

- The function/mission of the group changes over time and the Administrator begins to use the group as a source of consensus advice or recommendations. The more static the group composition, i.e., the same attendees at each meeting, the more likely an issue of FACA's applicability will arise.

## SCENARIO TWO - FACA APPLICABLE

**Factual assumptions:** Same fact pattern as described in paragraph 1 of Scenario One except rather than seeking information on individual corporate experiences the Administrator prefers to establish a committee composed of senior corporate officials which will meet, interact, deliberate, and advise him on a variety of issues arising out of the NPR. The committee structure could include a core membership with subgroups.

**FACA applies because:**

- The committee is established by an agency head (the Administrator) to obtain advice or recommendations for himself or other federal officers in the executive branch; and
- The committee is not composed wholly of full-time, or permanent part-time federal employees.

## REQUIREMENTS/PROCESS WHEN FACA APPLIES

**Establishment:**

- The Administrator is authorized to establish advisory committees to advise him/her on functions vested in the Administrator by the Federal Property and Administrative Services Act, or other GSA authorizing legislation.
- Committees which advise the Administrator also may be established by specific statutory language.
- No advisory committee can meet or take action prior to submitting a charter with the Administrator.
- The charter must contain the committee's designation, its objectives, its duration, the official to whom it reports, the agency or organization providing support, the duties of the committee, estimated operating costs, estimated number of meetings, and its termination date.

**Members:**

- The membership must be balanced in terms of points of view represented and the functions to be performed by the committee.
- Members are subject to ethics laws if they are appointed because of their personal knowledge, background or expertise. They are not subject to ethics laws if they are appointed to represent the point(s) of view of a particular group or segment of the public.
- Members usually are entitled to reimbursement for travel and per diem expenses. FACA also

provides for direct compensation, but many members serve gratuitously.

**Meetings:**

- Must have 15 days advance notice in the Federal Register.
- Must be open to the public unless limited statutory bases for closure apply.
- Must have a Designated Federal Officer in attendance.
- Must have minutes which are available for public inspection (except for portions of a meeting which was closed).

## FACA ADVISORY COMMITTEE MEMBERS APPLICABLE ETHICS STATUTES AND REGULATIONS

**SGE - Special Government Employee** (a person who serves not more than 130 days out of a 365 day period)

**FTE - Full-time regular government employees**

**REP - Representative of particular interest group**

I. Executive Orders apply to SGEs and FTEs but not to REPs
II. Standards of Conduct apply to SGEs and FTEs but not to REPs except as noted below.*
III. Conflicts of Interest apply to SGEs except as noted below** and FTEs but not to REPs.
IV. Ethics in Government Act including both the A. Public Financial Form and B. Confidential apply to SGEs and FTEs but not to REPs.

* Representative commission members would only be bound by the standards of conduct if the commission as a body made it applicable to all members. Representative members are reminded that nonpublic information should not be released to the public without permission.

** SGE's are treated less restrictively on a number of conflicts of interest laws.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| 501 School Street, SW, Suite 500 | ) | |
| Washington, D.C.  20024, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1446 (RMU) |
| | ) | |
| U.S. DEPARTMENT OF COMMERCE, | ) | |
| 14th Street and Constitution Avenue, N.W. | ) | |
| Washington, D.C.  20230, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CARLOS GUTIERREZ, in his official capacity as | ) | |
| Secretary of the U.S. Department of Commerce, | ) | |
| 14th Street and Constitution Avenue, N.W. | ) | |
| Washington, D.C.  20230, | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER**

The Motion to Dismiss for Lack of Subject Matter Jurisdiction or for Failure to State a

Claim filed by Defendants U.S. Department of Commerce and Carlos Gutierrez, Secretary of

Commerce, U.S. Department of Commerce, is hereby DENIED.

Dated:                                   _____
                                         The Hon. Ricardo M. Urbina
                                         United States District Judge